UNITED STATES DISTRICT COURT

for the

DISTRICT OF NEVADA

CASE NO. 2:25-cv-00295-CDS-MDC


NATIONAL SPECIALTY PHARMACY LLC,

Plaintiff,

v.

MAYBELLINE SANA, an individual

RAYNE BRIDGES, an individual, and

DOES 1 to 49, inclusive,

Defendants.

---

**DEFENDANT MAYBELLINE SANA'S MOTION TO DISMISS**

**I. INTRODUCTION**

Defendant Maybelline Sana, appearing Pro Se, respectfully moves this Honorable Court to

dismiss Plaintiff's claims under the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836, for

lack of subject matter jurisdiction pursuant to Rule 12(b)(1), and for failure to state a claim upon

which relief can be granted pursuant to Rule 12(b)(6). Plaintiff fails to identify a specific trade

secret, fails to allege use in interstate commerce, and lacks standing due to its business

closure. As such, the Court should also decline supplemental jurisdiction over the state law

claims pursuant to 28 U.S.C. § 1367(c)(3).

1

## II. ISSUES TO BE DECIDED

1. Whether Plaintiff has standing to bring this action under DTSA.

2. Whether Plaintiff identified a specific trade secret.

3. Whether Plaintiff established a connection to the alleged trade secrets and interstate commerce.

4. Whether Plaintiff alleged damages exceeding $75,000 to support federal diversity jurisdiction.

5. Whether Plaintiff's multiple filings in different states constitute forum shopping.

## III. LEGAL STANDARD

To state a claim under DTSA, a plaintiff must allege: (1) the existence of a trade secret as defined by 18 U.S.C. § 1839(3); (2) misappropriation as defined by § 1839(5); and (3) that the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce (§ 1836(b)(1)). See *InteliClear, LLC v. ETC Glob. Holdings, Inc.,* 978 F.3d 653, 657-58 (9th Cir. 2020).

A trade secret must be defined with sufficient particularity to separate it from general knowledge or vague categories of information. Conclusory allegations or "catchall" labels do not satisfy the DTSA's pleading requirements. See *InteliClear,* 978 F.3d at 658.

Additionally, under Rule 8 of the Federal Rules of Civil Procedure, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. See *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

## IV. ARGUMENT

## A. Plaintiff's Allegations of Ongoing Harm and Damages Are Contradicted by Its Business Closure

Plaintiff NSP claims it will 'continue to suffer significant damages and irreparable injury' (Complaint ¶152) and requests 'temporary, preliminary, and permanent injunctive relief' (¶153), as well as damages allegedly 'in excess of $75,000.00' (¶154, ¶163–164). However, Defendant is informed and believes that Plaintiff is no longer operating as a going business. Under *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.,* 528 U.S. 167 (2000), a party must demonstrate ongoing or imminent harm to maintain standing. If Plaintiff has ceased operations, it cannot plausibly assert a risk of future harm, a requirement under the DTSA for both injunctive relief and damages.

Additionally, Plaintiff cannot seek injunctive relief when there is no ongoing use of trade secrets. In *Already, LLC v. Nike, Inc.,* 568 U.S. 85 (2013), the Supreme Court held that a claim for injunctive relief is moot where there is no longer a live controversy. If Plaintiff has transferred its operations and trade secrets to an unrelated third party, it cannot claim ongoing misappropriation or irreparable harm.

Finally, Plaintiff's claimed damages 'in excess of $75,000.00' are unsupported by specific factual allegations. Without proof of ongoing operations or lost business opportunities, Plaintiff's claims are speculative and insufficient to meet the pleading standard under Rule 8 or establish federal jurisdiction under 28 U.S.C. § 1332. See *Silvaco Data Sys. v. Intel Corp.,* 184 Cal. App. 4th 210 (2010). A party that does not own the trade secret cannot sue under the DTSA, and speculative harm cannot justify relief. Accordingly, Plaintiff's claims should be dismissed.

**B. Plaintiff Lacks Standing Under DTSA Due to Business Closure and Loss of Ownership**

Under the Defend Trade Secrets Act (DTSA), only the "owner of a trade secret" may initiate an action for misappropriation. 18 U.S.C. § 1836(b)(1). If Plaintiff National Specialty Pharmacy (NSP) has ceased operations, it may lack the commercial stake necessary to assert a DTSA

claim. In *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.,* 528 U.S. 167 (2000), the Supreme Court reaffirmed that standing requires an ongoing injury or threat of harm. If NSP is no longer operating and cannot demonstrate current or future commercial use of the alleged trade secrets, the claim should be dismissed for lack of standing.

Additionally, if NSP transferred or shared its alleged trade secrets with another competitor—distinct from the one Defendant was allegedly associated with—it further undermines NSP's ability to assert a claim under DTSA. Courts have held that a plaintiff must retain exclusive ownership of the trade secret to claim misappropriation. See Silvaco *Data Sys. v. Intel Corp.,* 184 Cal. App. 4th 210 (2010). Without control or exclusivity over the information, NSP cannot establish legal ownership as required by 18 U.S.C. § 1836(b)(1).

A plaintiff must retain an active business interest in the trade secrets it seeks to protect. If the trade secrets were transferred to another entity or the business ceased operations, the plaintiff lacks a protectable interest. See *Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Group, Inc.,* 2020 WL 1442915 (S.D.N.Y. Mar. 24, 2020).

Plaintiff cannot demonstrate a real and immediate threat of future harm, which is required for standing. Accordingly, this claim should be dismissed.


### C. Plaintiff Cannot Claim Vague or Third-Party Information as Trade Secret

The DTSA protects only trade secrets that the plaintiff owns, controls, and maintains as confidential. In *Silvaco Data Sys. v. Intel Corp.,* 184 Cal. App. 4th 210 (2010), the court held that a party may not assert trade secret rights over information originating from third parties or already disclosed to others.

4

Here, Plaintiff references vendor data, provider relationships, and external contacts, but fails to establish ownership or exclusive control over this information. If any of this data originated with third parties or was shared externally, it cannot qualify as a trade secret under the DTSA. Likewise, if Plaintiff transferred or disclosed the information to another entity or competitor—as alleged—it no longer retains a protectable interest and lacks standing to sue under the DTSA. Courts have already rejected Plaintiff's DTSA claims for relying on vague and overbroad trade secret descriptions. For example, in *National Specialty Pharmacy, LLC v. Padhye,* No. 5:23-cv-04357-PCP, slip op. at 6 (N.D. Cal. May 16, 2024) (Exhibit B), the court dismissed NSP's DTSA claim where it listed only generic categories such as "vendor and partner information, proprietary formulas, business processes, pricing strategies, pricing data, marketing methods, other data, computer and software processes and systems …, and more." The court held these were "catchall" phrases that "do not clearly refer to tangible trade secret material as required" under 18 U.S.C. § 1839(3). Plaintiff repeats the same error here, offering similarly vague descriptions without specificity or proof of ownership.

Under *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009), legal conclusions must be supported by factual allegations sufficient to state a plausible claim. Plaintiff's broad categories and lack of detail fall short of this standard and fail to state a claim under Rule 8.

**D. No Interstate Commerce Connection**

The DTSA applies only when the alleged trade secret is "related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). Courts have consistently dismissed DTSA claims where plaintiffs fail to plead this essential jurisdictional element.

In *Gov't Emps. Ins. Co. v. Nealey,* 262 F. Supp. 3d 153, 172 (E.D. Pa. 2017), the court dismissed a DTSA claim because the complaint failed to allege any connection between the trade secrets and interstate commercial activity. Similarly, in *Nat'l Specialty Pharmacy, LLC v. One Way Drug, LLC,* the District of Nevada concluded NSP's claims were "too local" to qualify under the DTSA. The court held that references to federal reimbursement did not satisfy the required interstate nexus. See *One Way Drug,* No. 2:21-cv-01082-JAD-VCF (D. Nev. Sept. 28, 2021) (transcript at 19–21) (Exhibit C).

 Plaintiff's vague reference to having operations in California and Tennessee is insufficient to meet the DTSA's jurisdictional requirement. The statute requires that the trade secret be "related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). Courts have held that past or discontinued commercial activity does not establish a present connection to interstate commerce under the DTSA. Here, Plaintiff does not allege that the alleged trade secrets are currently being used—or intended for use—in any out-of-state sales or operations.

As the court also recognized in *One Way Drug*, NSP's failure to demonstrate any commercial link beyond state borders further undermined its DTSA claim. Plaintiff makes the same omission here. Without a demonstrated nexus to interstate commerce, the DTSA does not apply. Accordingly, Plaintiff's federal claim must be dismissed.

**E. Damages Are Not Pleaded With Specificity**

To survive a motion to dismiss, a plaintiff must plead more than conclusory statements regarding damages. In *Cognizant Tech. Sols. U.S. Corp. v. McAfee, Inc.,* 2020 WL 3025196 (N.D. Cal.2020), the court required the plaintiff to specify the basis and measure of damages with sufficient detail.

In this case, Plaintiff broadly alleges damages 'in excess of $75,000' but provides no basis for this figure, no documentation of losses, no lost contracts or clients, and no explanation of how the value of any trade secret was diminished. If Plaintiff is no longer in business, its alleged damages are even more speculative.

Such vague allegations are insufficient to meet pleading standards under Rule 8 or establish federal jurisdiction under 28 U.S.C. § 1332.

## F. Improper Venue and Forum Shopping

Plaintiff previously filed a similar complaint in the Northern District of California, where the court dismissed the claims against Defendant for lack of personal jurisdiction. Rather than appeal, Plaintiff initiated this new case in Nevada. This conduct constitutes forum shopping—a disfavored litigation tactic intended to obtain a more favorable forum.

Courts have long disapproved of forum shopping. In *Piper Aircraft Co. v. Reyno,* 454 U.S. 235 (1981), the Supreme Court emphasized that parties should not attempt to manipulate jurisdiction by filing the same or similar claims in multiple forums.

Plaintiff's behavior here strongly indicates improper forum shopping, and the Nevada case should be dismissed.

## G. Defendant Did Not Violate the Non-Compete Agreement

Defendant attaches as Exhibit A a true and correct copy of her At-Will Employment Agreement. This agreement contains a limited non-compete clause which provides:

"I agree that I will not, for a period of 3 years from the date of such termination, engage in any business that is competitive with the Company within a 5-mile radius of any physical location…"

Plaintiff's allegations relate to Defendant's prior employment with Taycann Wellness, a company that operated in a distinct business sector and outside the specified 5-mile geographic restriction outlined in the agreement. Upon information and belief, Plaintiff's principal place of business in Nevada was located at 3022 W. Post Road, Las Vegas, Nevada 89118. Plaintiff has not alleged that Taycann was a direct competitor that Defendant worked for within the restricted geographic scope.

As such, Plaintiff has failed to allege a breach of the non-compete provision. Further, since this alleged conduct underlies or contributes to Plaintiff's DTSA and related claims, those claims are also undermined.

Additionally, non-compete clauses must be interpreted narrowly under Nevada law and cannot be enforced where the employee's new employment does not compete directly with the employer's core business or occurs outside of the stated geographic limits.

Here, Plaintiff has failed to demonstrate that Defendant's previous employment with Taycann Wellness violated the terms of the agreement. Taycann operated in a different sector and was not within the 5-mile restricted radius. The claim of competition is speculative and unsupported.

This undermines Plaintiff's basis for alleging misappropriation or breach of duty as a predicate for the DTSA claim.

## H. Plaintiff's Injunctive Relief Request Is Moot

Plaintiff seeks temporary, preliminary, and permanent injunctive relief. However, Defendant is no longer employed with the alleged competitor (Taycann Wellness). As a result, there is no ongoing conduct for the court to enjoin.

In *Already, LLC v. Nike, Inc.,* 568 U.S. 85 (2013), the Supreme Court found that an injunction is moot when there is no live controversy or ongoing harm. This principle applies here, where the circumstances no longer support equitable relief.

Therefore, Plaintiff's claim for injunctive relief should be dismissed as moot.

## I. Court Should Decline Supplemental Jurisdiction

Once the federal DTSA claim is dismissed, the Court should decline to exercise supplemental jurisdiction over any remaining state law claims. Under 28 U.S.C. § 1367(c)(3), federal courts may decline jurisdiction when all federal claims have been dismissed.

In *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343 (1988), the Supreme Court endorsed dismissal of state claims in the absence of a valid federal question.

Given the failure of Plaintiff's DTSA claim, this Court should not retain jurisdiction over any state-based causes of action and should dismiss the complaint in full.

## V. CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court:

1. Dismiss Plaintiff's DTSA claim under Rules 12(b)(1) and 12(b)(6), with prejudice;

2. Dismiss or transfer this case for improper venue;

3. Deny Plaintiff's request for injunctive relief as moot;

4. Decline supplemental jurisdiction over state law claims;

5. Grant such other relief as the Court deems just and proper.

Because Plaintiff's DTSA claim fails on multiple grounds—lack of specificity, ownership, interstate nexus, and standing—dismissal is warranted as a matter of law.

Dated: March 21, 2025

Respectfully submitted,

Maybelline Sana

Pro Se Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on March 21, 2025, I caused a true and correct copy of the foregoing

DEFENDANT MAYBELLINE SANA'S MOTION TO DISMISS to be served on the following

individuals via The Court's electronic filing system:

Attorneys for the Plaintiff

Jennifer W. Arledge (jarledge@hone.law)

Kelly B. Stout (kstout@hone.law)

HONE LAW

701 N. Green Valley Parkway, Suite 200

Henderson, NV 89074

---

Pro Se

Rayne Bridges (bridgesrayne@gmail.com)

7340 Jelson Falls Street

Las Vegas, NV 89131

Dated: March 21, 2025

Maybelline Sana

Pro Se Defendant

## DECLARATION OF MAYBELLINE SANA

I, Maybelline Sana, declare as follows:

1. I am the Defendant in the above-captioned matter. I make this declaration in support of my Motion to Dismiss.

2. I have personal knowledge of the facts stated in the Motion to Dismiss, and if called upon to testify, I could and would testify truthfully to those facts.

3. Attached as Exhibit A to my Motion is a true and correct copy of my At-Will Employment Agreement with National Specialty Pharmacy, LLC that I signed on May 21, 2018.

4. The other exhibits attached to my Motion, including the Order in National Specialty Pharmacy, LLC v. Padhye (Exhibit B) and the Transcript in National Specialty Pharmacy, LLC v. One Way Drug, LLC (Exhibit C), are true and correct copies of court documents obtained in those respective matters.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 21st day of March, 2025, in Las Vegas, Nevada.

Maybelline Sana

**Index of Exhibits**

Exhibit A - At-Will Employment Agreement between Maybelline Sana and National Specialty

Pharmacy,

LLC

Exhibit B - Order from National Specialty Pharmacy, LLC v. Padhye, No. 5:23-cv-04357-PCP

(N.D. Cal.

May 16, 2024)

Exhibit C - Transcript Excerpt from National Specialty Pharmacy, LLC v. One Way Drug, LLC,

No.

2:21-cv-01082-JAD-VCF (D. Nev. Sept. 28, 2021)

**EXHIBIT A**

At-Will Employment Agreement between Maybelline Sana and National Specialty Pharmacy,

LLC

This agreement is cited in support of Defendant's argument that no enforceable non-compete or

ongoing obligation exists under the Defend Trade Secrets Act (DTSA).

**NATIONAL SPECIALTY PHARMACY, LLC**
**AT-WILL EMPLOYMENT, CONFIDENTIAL INFORMATION,**
**AND INVENTION ASSIGNMENT AGREEMENT**

As a condition of my employment with National Specialty Pharmacy, LLC, its subsidiaries, affiliates, successors or assigns (together, the "**Company**"), and in consideration of my employment with the Company and my receipt of the compensation now and hereafter paid to me by Company, I agree to the following provisions of this National Specialty Pharmacy, LLC At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement (this "**Agreement**"):

1.     **AT-WILL EMPLOYMENT**

I UNDERSTAND AND ACKNOWLEDGE THAT MY EMPLOYMENT WITH THE COMPANY IS FOR NO SPECIFIED TERM AND CONSTITUTES "AT-WILL" EMPLOYMENT. I ALSO UNDERSTAND THAT ANY REPRESENTATION TO THE CONTRARY IS UNAUTHORIZED AND NOT VALID UNLESS IN WRITING AND SIGNED BY THE AN AUTHORIZED REPRESENTATIVE OF NATIONAL SPECIALTY PHARMACY, LLC ACCORDINGLY, I ACKNOWLEDGE THAT MY EMPLOYMENT RELATIONSHIP MAY BE TERMINATED AT ANY TIME, WITH OR WITHOUT GOOD CAUSE OR FOR ANY OR NO CAUSE, AT MY OPTION OR AT THE OPTION OF THE COMPANY, WITH OR WITHOUT NOTICE. I FURTHER ACKNOWLEDGE THAT THE COMPANY MAY MODIFY JOB TITLES, SALARIES, AND BENEFITS FROM TIME TO TIME AS IT DEEMS NECESSARY.

2.     **APPLICABILITY TO PAST ACTIVITIES**

National Specialty Pharmacy, LLC and I acknowledge that I have been engaged to provide services by National Specialty Pharmacy, LLC for a period of time prior to the date of this Agreement (the "**Prior Engagement Period**"). Accordingly, I agree that if and to the extent that, during the Prior Engagement Period: (i) I received access to any information from or on behalf of Company that would have been "Company Confidential Information" (as defined below) if I received access to such information during the period of my employment with Company under this Agreement; or (ii) I conceived, created, authored, invented, developed or reduced to practice any item, including any intellectual property rights with respect thereto, that would have been an "Invention" (as defined below) if conceived, created, authored, invented, developed or reduced to practice during the period of my employment with Company under this Agreement; then any such information shall be deemed "Company Confidential Information" hereunder and any such item shall be deemed an "Invention" hereunder, and this Agreement shall apply to such information or item as if conceived, created, authored, invented, developed or reduced to practice under this Agreement.

3.     **CONFIDENTIALITY**

A.     *Definition of Confidential Information.* I understand that "**Company Confidential Information**" means information (including any and all combinations of individual items of information) that the Company has or will develop, acquire, create, compile, discover or

*lla 5-21-18*

own, that has value in or to the Company's business which is not generally known and which the Company wishes to maintain as confidential. Company Confidential Information includes both information disclosed by the Company to me, and information developed or learned by me during the course of my employment with Company. Company Confidential Information also includes all information of which the unauthorized disclosure could be detrimental to the interests of Company, whether or not such information is identified as Company Confidential Information. By example, and without limitation, Company Confidential Information includes any and all non-public information that relates to the actual or anticipated business and/or products, research or development of the Company, or to the Company's technical data, trade secrets, or know-how, including, but not limited to, research, product plans, or other information regarding the Company's products or services and markets therefor, customer lists, patient and physician information, and customers (including, but not limited to, customers of the Company on which I called or with which I may become acquainted during the term of my employment), software, developments, inventions, discoveries, ideas, processes, formulas, technology, designs, drawings, hardware configuration information, marketing, finances, and other business information disclosed by the Company either directly or indirectly in writing, orally or by drawings or inspection of premises, parts, equipment, or other Company property. Notwithstanding the foregoing, Company Confidential Information shall not include any such information which I can establish (i) was publicly known or made generally available prior to the time of disclosure by Company to me; (ii) becomes publicly known or made generally available after disclosure by Company to me through no wrongful action or omission by me; or (iii) is in my rightful possession, without confidentiality obligations, at the time of disclosure by Company as shown by my then-contemporaneous written records; provided that any combination of individual items of information shall not be deemed to be within any of the foregoing exceptions merely because one or more of the individual items are within such exception, unless the combination as a whole is within such exception. I understand that nothing in this Agreement is intended to limit employees' rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law.

      B.    *Nonuse and Nondisclosure*. I agree that during and after my employment with the Company, I will hold in the strictest confidence, and take all reasonable precautions to prevent any unauthorized use or disclosure of Company Confidential Information, and I will not (i) use the Company Confidential Information for any purpose whatsoever other than for the benefit of the Company in the course of my employment, or (ii) disclose the Company Confidential Information to any third party without the prior written authorization of an authorized representative of the Company. Prior to disclosure when compelled by applicable law; I shall provide prior written notice to the General Counsel of National Specialty Pharmacy, LLC. I agree that I obtain no title to any Company Confidential Information, and that as between Company and myself, National Specialty Pharmacy, LLC retains all Confidential Information as the sole property of National Specialty Pharmacy, LLC I understand that my unauthorized use or disclosure of Company Confidential Information during my employment may lead to disciplinary action, up to and including immediate termination and legal action by the Company. I understand that my obligations under this **Section 3.B** shall continue after termination of my employment.

      C.    *Former Employer Confidential Information*. I agree that during my employment with the Company, I will not improperly use, disclose, or induce the Company to use any proprietary information or trade secrets of any former employer or other person or entity with

-2-

*AA 5-21-18*

which I have an obligation to keep in confidence. I further agree that I will not bring onto the Company's premises or transfer onto the Company's technology systems any unpublished document, proprietary information, or trade secrets belonging to any such third party unless disclosure to, and use by, the Company has been consented to in writing by such third party.

D. *Third Party Information*. I recognize that the Company has received and in the future will receive from third parties associated with the Company, e.g., the Company's customers, suppliers, physicians, patients, partners, or collaborators ("**Associated Third Parties**"), their confidential or proprietary information ("**Associated Third Party Confidential Information**") subject to a duty under HIPAA and on the Company's part to maintain the confidentiality of such Associated Third Party Confidential Information and to use it only for certain limited purposes. I agree at all times during my employment with the Company and thereafter, that I owe the Company and its Associated Third Parties a duty to hold all such Associated Third Party Confidential Information in the strictest confidence, and not to use it or to disclose it to any person, firm, corporation, or other third party except as necessary in carrying out my work for the Company consistent with the Company's agreement with such Associated Third Parties. I further agree to comply with any and all laws, regulations and Company policies and guidelines that may be adopted from time to time regarding Associated Third Parties and Associated Third Party Confidential Information. I understand that my unauthorized use or disclosure of Associated Third Party Confidential Information or violation of any law, regulation or Company policies during my employment may lead to disciplinary action, up to and including immediate termination and legal action by the Company and the relevant regulatory agencies.

4. **OWNERSHIP**

A. *Assignment of Inventions*. As between the Company and myself, I agree that all right, title, and interest in and to any and all copyrightable material, notes, records, drawings, designs, inventions, improvements, developments, discoveries, ideas and trade secrets conceived, discovered, authored, invented, developed or reduced to practice by me, solely or in collaboration with others, during the period of time I am in the employ of the Company (including during my off-duty hours), or with the use of Company's equipment, supplies, facilities, or Company Confidential Information, and any copyrights, patents, trade secrets, mask work rights or other intellectual property rights relating to the foregoing, except as provided in **Section Error! Reference source not found.** below (collectively, "**Inventions**"), are the sole property of National Specialty Pharmacy, LLC I also agree to promptly make full written disclosure to National Specialty Pharmacy, LLC of any Inventions, and to deliver and assign and hereby irrevocably assign fully to National Specialty Pharmacy, LLC all of my right, title and interest in and to Inventions. I agree that this assignment includes a present conveyance to National Specialty Pharmacy, LLC of ownership of Inventions that are not yet in existence. I further acknowledge that all original works of authorship that are made by me (solely or jointly with others) within the scope of and during the period of my employment with the Company and that are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act. I understand and agree that the decision whether or not to commercialize or market any Inventions is within the Company's sole discretion and for the Company's sole benefit, and that no royalty or other consideration will be due to me as a result of the Company's efforts to commercialize or market any such Inventions.

-3-

*LQ  8-21-18*

      B.    *Pre-Existing Materials.* I will inform National Specialty Pharmacy, LLC in writing before incorporating any inventions, discoveries, ideas, original works of authorship, developments, improvements, trade secrets and other proprietary information or intellectual property rights owned by me or in which I have an interest prior to, or separate from, my employment with the Company ("**Prior Inventions**") into any Invention or otherwise utilizing any such Prior Invention in the course of my employment with the Company; and the Company is hereby granted a nonexclusive, royalty-free, perpetual, irrevocable, transferable worldwide license (with the right to grant and authorize sublicenses) to make, have made, use, import, offer for sale, sell, reproduce, distribute, modify, adapt, prepare derivative works of, display, perform, and otherwise exploit such Prior Inventions, without restriction, including, without limitation, as part of or in connection with such Invention, and to practice any method related thereto. I will not incorporate any inventions, discoveries, ideas, original works of authorship, developments, improvements, trade secrets and other proprietary information or intellectual property rights owned by any third party into any Invention without National Specialty Pharmacy, LLC's prior written permission. I have attached hereto as <u>Exhibit A</u>, a list describing all Prior Inventions or, if no such list is attached, I represent and warrant that there are no such Prior Inventions. Furthermore, I represent and warrant that if any Prior Inventions are included on <u>Exhibit A</u>, they will not materially affect my ability to perform all obligations under this Agreement.

      C.    *Moral Rights.* Any assignment to National Specialty Pharmacy, LLC of Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "**Moral Rights**"). To the extent that Moral Rights cannot be assigned under applicable law, I hereby waive and agree not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

      D.    *Maintenance of Records.* I agree to keep and maintain adequate, current, accurate, and authentic written records of all Inventions made by me (solely or jointly with others) during the term of my employment with the Company. The records will be in the form of notes, sketches, drawings, electronic files, reports, or any other format that may be specified by the Company. As between Company and myself, the records are and will be available to and remain the sole property of National Specialty Pharmacy, LLC at all times.

      E.    *Further Assurances.* I agree to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, and all other instruments that the Company shall deem proper or necessary in order to apply for, register, obtain, maintain, defend, and enforce such rights, and in order to deliver, assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title, and interest in and to all Inventions, and testifying in a suit or other proceeding relating to such Inventions. I further agree that my obligations under this **Section 4.E** shall continue after the termination of this Agreement.

-4-

*lca 5-21-18*

F.    *Attorney-in-Fact.* I agree that, if the Company is unable because of my unavailability, mental or physical incapacity, or for any other reason to secure my signature with respect to any Inventions, including, without limitation, for the purpose of applying for or pursuing any application for any United States or foreign patents or mask work or copyright registrations covering the Inventions assigned to National Specialty Pharmacy, LLC in **Section 4.A**, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney-in-fact, to act for and on my behalf to execute and file any papers and oaths, and to do all other lawfully permitted acts with respect to such Inventions to further the prosecution and issuance of patents, copyright and mask work registrations with the same legal force and effect as if executed by me. This power of attorney shall be deemed coupled with an interest, and shall be irrevocable.

5.    <u>CONFLICTING OBLIGATIONS</u>

A.    *Current Obligations.* I agree that during the term of my employment with the Company, I will not engage in or undertake any other employment, occupation, consulting relationship, or commitment that is directly related to the business in which the Company is now involved or becomes involved or has plans to become involved, nor will I engage in any other activities that conflict with my obligations to the Company.

B.    *Prior Relationships.* Without limiting **Section 5.A**, I represent and warrant that I have no other agreements, relationships, or commitments to any other person or entity that conflict with the provisions of this Agreement, my obligations to the Company under this Agreement, or my ability to become employed and perform the services for which I am being hired by the Company. I further agree that if I have signed a confidentiality agreement or similar type of agreement with any former employer or other entity, I will comply with the terms of any such agreement to the extent that its terms are lawful under applicable law. I represent and warrant that after undertaking a careful search (including searches of my computers, cell phones, electronic devices, and documents), I have returned all property and confidential information belonging to all prior employers (and/or other third parties I have performed services for in accordance with the terms of my applicable agreement). Moreover, I agree to fully indemnify the Company, its directors, officers, agents, employees, investors, shareholders, administrators, affiliates, divisions, subsidiaries, predecessor and successor corporations, and assigns for all verdicts, judgments, settlements, and other losses incurred by any of them resulting from my breach of my obligations under any agreement with a third party to which I am a party or obligation to which I am bound, as well as any reasonable attorneys' fees and costs if the plaintiff is the prevailing party in such an action, except as prohibited by law.

6.    <u>RETURN OF COMPANY MATERIALS</u>

A.    *Definition of Electronic Media Equipment and Electronic Media Systems.* I understand that **"Electronic Media Equipment"** includes, but is not limited to, computers, external storage devices, thumb drives, handheld electronic devices, telephone equipment, and other electronic media devices. I understand that **"Electronic Media Systems"** includes, but is not limited to, computer servers, messaging and email systems or accounts, and web-based services (including

-5-

HQ 5-21-18

cloud-based information storage accounts), whether provided for my use directly by the company or by third-party providers on behalf of the company.

B.    *Return of Company Property.* I understand that anything that I created or worked on for the Company while working for the Company belongs solely to the Company and that I cannot remove, retain, or use such information without the Company's express written permission. Accordingly, upon separation from employment with the Company or upon the Company's request at any other time, I will immediately deliver to National Specialty Pharmacy, LLC, and will not keep in my possession, recreate, or deliver to anyone else, any and all Company property, including, but not limited to, Company Confidential Information, Associated Third Party Confidential Information, all Company equipment including all Company Electronic Media Equipment, all tangible embodiments of the Inventions, all electronically stored information and passwords to access such property, Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, charts, any other documents and property, and reproductions of any of the foregoing items, including, without limitation, those records maintained pursuant to **Section 4.D**.

C.    *Return of Company Information on Company Electronic Media Equipment.* In connection with my obligation to return information to the Company, I agree that I will not copy, delete, or alter any information, including personal information voluntarily created or stored, contained upon my Company Electronic Media Equipment before I return the information to the Company.

D.    *Return of Company Information on Personal Electronic Media Equipment.* In addition, if I have used any personal Electronic Media Equipment or personal Electronic Media Systems to create, receive, store, review, prepare or transmit any Company information, including but not limited to, Company Confidential Information, I agree to make a prompt and reasonable search for such information in good faith, including reviewing any personal Electronic Media Equipment or personal Electronic Media Systems to locate such information and if I locate such information I agree to notify the Company of that fact and then provide the Company with a computer-useable copy of all such Company information from those equipment and systems; and I agree to cooperate reasonably with the Company to verify that the necessary copying is completed (including upon request providing a sworn declaration confirming the return of property and deletion of information), and, upon confirmation of compliance by the Company, I agree to delete and expunge all Company information.

E.    *No Expectation of Privacy in Company Property.* I understand that I have no expectation of privacy in Company property, and I agree that any Company property situated on Company premises, or held by third-party providers for the benefit of the company, is subject to inspection by Company personnel at any time with or without further notice. I also understand and agree that as it relates to the Company's desire to protect its confidential and proprietary information, I have no expectation of privacy as to any personal Electronic Media Equipment or personal Electronic Media Systems that I have used for Company purposes. I further agree that the Company, at its sole discretion, may have access to such personal Electronic Media Equipment or personal Electronic Media Systems to retrieve, destroy, or ensure the permanent deletion of Company information from such equipment or systems. I also consent to an exit interview and an

-6-

audit to confirm my compliance with this **Section 6**, and I will certify in writing that I have complied with the requirements of this **Section 6**.

7.    **TERMINATION CERTIFICATION**

Upon separation from employment with the Company, I agree to immediately sign and deliver to the Company the "Termination Certification" attached hereto as Exhibit C. I also agree to keep National Specialty Pharmacy, LLC advised of my home and business address for a period of three (3) years after termination of my employment with the Company, so that the Company can contact me regarding my continuing obligations provided by this Agreement.

8.    **NOTIFICATION OF NEW EMPLOYER**

In the event that I leave the employ of the Company, I hereby grant consent to notification by the Company to my new employer about my obligations under this Agreement.

9.    **SOLICITATION OF EMPLOYEES**

To the fullest extent permitted under applicable law, I agree that during my employment and for a period of twelve (12) months immediately following the termination of my relationship with the Company for any reason, whether voluntary or involuntary, with or without cause, I will not directly or indirectly solicit any of the Company's employees to leave their employment at the Company. I agree that nothing in this **Section** 9 shall affect my continuing obligations under this Agreement during and after this twelve (12) month period, including, without limitation, my obligations under **Section** 3.

10.    **CONFLICT OF INTEREST GUIDELINES**

I agree to diligently adhere to all policies of the Company, including the Company's insider trading policies and the Company's Conflict of Interest Guidelines. A copy of the Company's current Conflict of Interest Guidelines is attached as Exhibit D hereto, but I understand that these Conflict of Interest Guidelines may be revised from time to time during my employment.

11.    **REPRESENTATIONS**

Without limiting my obligations under Section 4.E above, I agree to execute any proper oath or verify any proper document required to carry out the terms of this Agreement. I represent and warrant that my performance of all the terms of this Agreement will not breach any agreement to keep in confidence information acquired by me in confidence or in trust prior to my employment by the Company. I hereby represent and warrant that I have not entered into, and I will not enter into, any oral or written agreement in conflict herewith.

12.    **NON-CIRCUMVENTION, NON-COMPETITION AND NON-SOLICITATION**

I agree that I will not directly or indirectly, individually or together with any other persons, investors, firms or companies (a) interfere with, circumvent, avoid, bypass or obviate, or permit any of its representatives or affiliates to interfere with, circumvent, avoid, bypass or obviate the

-7-

Company's (or any of its representatives or affiliates') right in, agreements relating to and/or contacts with respect to any of the Company's current or proposed customers or clients (b) enter into discussions with any third party introduced to me by the Company (or any of such party's members, shareholders, officers, directors, employees, agents, affiliates, creditors or contractual counterparts), or initiate or negotiate with respect to any transactional relationship with any such third party (or any of its shareholders, officers, directors, employees, agents, affiliates creditors or contractual counterparts), or circumvent or attempt to circumvent the discussions and negotiations currently or hereafter entered into with respect to the Company's current or proposed customers or clients. In the event that my employment or other business relationship with the Company is terminated for any reason, I agree that I will not, for a period of 3 years from the date of such termination, engage in any business that is competitive with the Company within a 5 mile radius of any physical location of the Company nor solicit the services of any current or future employee or consultant of the Company

### 13.    AUDIT

I acknowledge that I have no reasonable expectation of privacy in any computer, handheld device, telephone, voicemail, email or other technology system that is used to conduct the business of the Company. All information, data, and messages created, received, sent, or stored in these systems are, at all times, the property of the Company. As such, the Company has the right to audit and search all such items and systems, without further notice to me, to ensure that the Company is licensed to use the software on the Company's devices in compliance with the Company's software licensing policies, to ensure compliance with the Company's policies, and for any other business-related purposes in the Company's sole discretion. I understand that I am not permitted to add any unlicensed, unauthorized, or non-compliant applications to the Company's technology systems, including, without limitation, open source or free software not authorized by the Company, and that I shall refrain from copying unlicensed software onto the Company's technology systems or using non-licensed software or websites. I understand that it is my responsibility to comply with the Company's policies governing use of the Company's documents and the internet, email, telephone, and technology systems to which I will have access in connection with my employment.

I am aware that the Company has or may acquire software and systems that are capable of monitoring and recording all Company network traffic to and from any computer, handheld device, telephone, voicemail, email or other technology system I may use to access the Company's internal networks. The Company reserves the right to access, review, copy, and delete any of the information, data, or messages accessed through these systems with or without notice to me and/or in my absence. This includes, but is not limited to, all e-mail messages sent or received, all website visits, all chat sessions, all news group activity (including groups visited, messages read, and postings by me), and all file transfers into and out of the Company's internal networks. The Company further reserves the right to retrieve previously deleted messages from e-mail or voicemail and monitor usage of the Internet, including websites visited and any information I have downloaded. In addition, the Company may review Internet and technology systems activity and analyze usage patterns, and may choose to publicize this data to assure that technology systems are devoted to legitimate business purposes.

-8-

*MM 5-21-18*

14.    <u>MISCELLANEOUS</u>

A.    *Governing Law; Consent to Personal Jurisdiction.* This Agreement will be governed by the laws of the State of Nevada without regard to Nevada's conflicts of law rules that may result in the application of the laws of any jurisdiction other than Nevada. To the extent that any lawsuit is permitted under this Agreement, I hereby expressly consent to the personal and exclusive jurisdiction and venue of the state and federal courts located in Nevada for any lawsuit filed against me by the Company.

B.    *Assignability.* This Agreement will be binding upon my heirs, executors, assigns, administrators, and other legal representatives, and will be for the benefit of the Company, its successors, and its assigns. There are no intended third-party beneficiaries to this Agreement, except as may be expressly otherwise stated. Notwithstanding anything to the contrary herein, National Specialty Pharmacy, LLC may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of National Specialty Pharmacy, LLC's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or stock, or otherwise.

C.    *Entire Agreement.* This Agreement, together with the Exhibits herein and any executed written offer letter between me and the Company, to the extent such materials are not in conflict with this Agreement, sets forth the entire agreement and understanding between the Company and me with respect to the subject matter herein and supersedes all prior written and oral agreements, discussions, or representations between us, including, but not limited to, any representations made during my interview(s) or relocation negotiations. I represent and warrant that I am not relying on any statement or representation not contained in this Agreement. Any subsequent change or changes in my duties, salary, compensation, conditions or any other terms of my employment will not affect the validity or scope of this Agreement.

D.    *Headings.* Headings are used in this Agreement for reference only and shall not be considered when interpreting this Agreement.

E.    *Severability.* If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be invalid or unenforceable, such provision will be enforced to the maximum extent permissible so as to effect the intent of the Parties, and the remainder of this Agreement will continue in full force and effect.

F.    *Modification, Waiver.* No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in a writing signed by the an authorized representative of National Specialty Pharmacy, LLC and me. Waiver by National Specialty Pharmacy, LLC of a breach of any provision of this Agreement will not operate as a waiver of any other or subsequent breach.

G.    *Survival.* The rights and obligations of the parties to this Agreement will survive termination of my employment with the Company.

-9-

*JCH* 5-21-18

Date: _5-21-18_

Signature

_MAYBELLINE ASH_
Name of Employee (typed or printed)

Witness:

_____
Signature

_____
Name (typed or printed)

-10-

## EXHIBIT C

### NATIONAL SPECIALTY PHARMACY, LLC TERMINATION CERTIFICATION

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, any other documents or property, or reproductions of any and all aforementioned items belonging to National Specialty Pharmacy, LLC, its subsidiaries, affiliates, successors or assigns (together, the "**Company**").

I further certify that I have complied with all the terms of the Company's At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement signed by me, including the reporting of any inventions and original works of authorship (as defined therein) conceived or made by me (solely or jointly with others), as covered by that agreement.

I further agree that, in compliance with the At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement, I will preserve as confidential all Company Confidential Information and Associated Third Party Confidential Information, including trade secrets, confidential knowledge, data, or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, databases, other original works of authorship, customer lists, business plans, financial information, or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants, or licensees.

I also agree that for twelve (12) months from this date, I will not directly or indirectly solicit any of the Company's employees to leave their employment at the Company. I agree that nothing in this paragraph shall affect my continuing obligations under the At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement during and after this twelve (12) month period, including, without limitation, my obligations under **Section** 3 (Confidentiality) thereof.

After    leaving    the    Company's    employment,    I    will    be    employed    by
_____ in the position of
_____.

Date: _____      _____
                                      Signature

                                      _____
                                      Name of Employee (typed or printed)

Address for Notifications:            _____

                                      _____

_ila_ 5-21-18

## EXHIBIT D

## NATIONAL SPECIALTY PHARMACY, LLC CONFLICT OF INTEREST GUIDELINES

It is the policy of National Specialty Pharmacy, LLC to conduct its affairs in strict compliance with the letter and spirit of the law and to adhere to the highest principles of business ethics. Accordingly, all officers, employees, and independent contractors must avoid activities that are in conflict, or give the appearance of being in conflict, with these principles and with the interests of the Company. The following are potentially compromising situations that must be avoided:

1.      Revealing confidential information to outsiders or misusing confidential information. Unauthorized divulging of information is a violation of this policy whether or not for personal gain and whether or not harm to the Company is intended. (The At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement elaborates on this principle and is a binding agreement.)

2.      Accepting or offering substantial gifts, excessive entertainment, favors, or payments that may be deemed to constitute undue influence or otherwise be improper or embarrassing to the Company.

3.      Participating in civic or professional organizations that might involve divulging confidential information of the Company.

4.      Initiating or approving personnel actions affecting reward or punishment of employees or applicants where there is a family relationship or is or appears to be a personal or social involvement.

5.      Initiating or approving any form of personal or social harassment of employees.

6.      Investing or holding outside directorship in suppliers, customers, or competing companies, including financial speculations, where such investment or directorship might influence in any manner a decision or course of action of the Company.

7.      Borrowing from or lending to employees, customers, or suppliers.

8.      Acquiring real estate of interest to the Company.

9.      Improperly using or disclosing to the Company any proprietary information or trade secrets of any former or concurrent employer or other person or entity with whom obligations of confidentiality exist.

10.     Unlawfully discussing prices, costs, customers, sales, or markets with competing companies or their employees.

11.     Making any unlawful agreement with distributors with respect to prices.

12.     Improperly using or authorizing the use of any inventions that are the subject of patent claims of any other person or entity.

13.     Engaging in any conduct that is not in the best interest of the Company.

Each officer, employee, and independent contractor must take every necessary action to ensure compliance with these guidelines and to bring problem areas to the attention of higher

𝒦𝒟𝓇 5-21-18

management for review. Violations of this conflict of interest policy may result in discharge without warning. I understand that nothing in this Agreement is intended to limit employees' rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law.

-2-

*AeN 5·21–18*

**EXHIBIT B**

Order from National Specialty Pharmacy, LLC v. Padhye,

Case No. 5:23-cv-04357-PCP (N.D. Cal. May 16, 2024)


This order dismissed NSP's DTSA claims for failing to identify specific trade secrets and for

lack of connection to interstate commerce.

1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7 | NATIONAL SPECIALTY PHARMACY, LLC, | Case No. 23-cv-04357-PCP

8 |            Plaintiff, | **ORDER GRANTING MOTIONS TO DISMISS**

9 |     v. |

10 | | Re: Dkt. Nos. 14, 17, 28, 44

11 | SAMEER PADHYE, et al., |

           Defendants.

12

13      This is a dispute between a Nevada-based Delaware LLC and four of its former employees,

14 two businesses allegedly associated with some of those former employees, and one former

15 employee's brother. Four defendants have filed motions to dismiss. All four motions are granted.

16 **I.    Background**

17      The following allegations from the complaint are taken as true in resolving this motion.

18      Plaintiff National Specialty Pharmacy, LLC is a compounding pharmacy. It develops,

19 compounds, markets, and distributes medicines. Defendants Sameer Padhye, Maybelline Sana,

20 Rayne Bridges, and Daniel Brown are former employees of NSP. Ms. Sana was hired as a

21 pharmacy technician in May 2018 and later promoted to run human resources. Mr. Padhye was

22 hired as a strategist in October 2022. Ms. Bridges was hired as an account executive in December

23 2022. Mr. Brown was hired as a marketing and content manager in January 2023. Mr. Padhye was

24 fired in June 2023. Ms. Bridges, Ms. Sana, and Mr. Brown resigned later that summer.

25      The complaint alleges that these former employees took NSP's confidential information

26 and other property and transferred it to their affiliated businesses, defendants Coligomed, Inc. and

27 Enlil, Inc. Enlil is owned by Sameer Padhye, and Coligomed is owned by his brother, Abhinay

28 Padhye. The complaint also alleges that Ms. Sana lied to coworkers about NSP executives, that

United States District Court
Northern District of California

United States District Court
Northern District of California

1    other defendants modified NSP corporate records without permission, and that several of the

2    former employees improperly accessed NSP systems both before and after their terminations.

3          NSP filed the operative complaint in September 2023, which four defendants moved to

4    dismiss. The case was then briefly stayed at NSP's request, after which the Court held a hearing.

5    **II.    Legal Standards**

6          Federal Rule of Civil Procedure 8 requires a "short and plain statement of the claim

7    showing that the pleader is entitled to relief," with allegations that are "simple, concise, and

8    direct." A complaint must "plausibly suggest" entitlement to relief. *Ashcroft v. Iqbal*, 556 U.S.

9    662, 681 (2009). It must also give "fair notice" and "enable" the defendant "to defend itself

10   effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). A pleading cannot be "so vague

11   or ambiguous" that an opponent "cannot reasonably prepare a response." *See* Fed. R. Civ. P. 12(e).

12         A complaint that does not state a claim upon which relief can be granted can be dismissed

13   under Rule 12(b)(6). "A claim has facial plausibility when the plaintiff pleads factual content that

14   allows the court to draw the reasonable inference that the defendant is liable." *Iqbal*, 556 U.S. at

15   678. Legal conclusions must be "supported by factual allegations." *Id.* at 679. The Court must

16   "accept all factual allegations" and "construe the pleadings in the light most favorable to the

17   nonmoving party." *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029–30 (9th Cir. 2009).

18   **III.   Rayne Bridges's Motion To Dismiss for Lack of Personal Jurisdiction Is Granted.**

19         Ms. Bridges is representing herself. She moves to dismiss all claims against her for lack of

20   personal jurisdiction and for failure to state a claim.

21         Ms. Bridges asserts that she is a Nevada resident. She states that she never performed work

22   in California for NSP, and that she has no other California contacts. NSP bases jurisdiction on Ms.

23   Bridges' employment agreement, which includes the following governing law clause:

24              This Agreement will be governed by the laws of the State of
                California without regard to California's conflicts of law rules…. To
25              the extent that any lawsuit is permitted under this Agreement, I hereby
                expressly consent to the personal and exclusive jurisdiction and venue
26              of the state and federal courts located in California for any lawsuit
                filed against me by the Company.
27

28   Dkt. No. 1-1, at 100.

                                            30

United States District Court
Northern District of California

Because contract interpretation and enforcement present matters of state law, the Court first applies California's choice of law rules to select the rule of decision. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). California law applies by default unless a party invokes another jurisdiction's law. *Hurtado v. Super. Ct.*, 11 Cal. 3d 574, 581 (1974). Here, neither party invokes another forum's law, so the Court applies California law.

Under California law, mandatory forum selection clauses such as the one in Ms. Bridges's contract are "given effect unless enforcement would be unreasonable or unfair." *Verdugo v. Alliantgroup, L.P.*, 237 Cal. App. 4th 141, 147 (2015). "A clause is reasonable if it has a logical connection with at least one of the parties or their transaction." *Id.*

The Court concludes that California has no logical connection to Ms. Bridges or to her work with NSP. Ms. Bridges is a Nevada resident who asserts that she has no contacts with California. NSP is a Delaware LLC with its principal place of business in Las Vegas, Nevada. Ms. Bridges asserts that she completed all relevant work for NSP entirely within Nevada. And while the complaint asserts that NSP is "registered to do business" in California and has "operations" in the state (along with several others), it is not clear what connection NSP has with California in the context of Ms. Bridges's employment in Nevada—especially since other employment agreements submitted by NSP include a Nevada forum selection clause. *See* Dkt. No. 1-1, at 56 (Ms. Sana's agreement).

Accordingly, the California forum selection clause in Ms. Bridges' employment agreement is not reasonable and cannot be enforced. And because the forum selection and personal jurisdiction consent language in the clause are "inextricably bound up," *cf. Verdugo*, 237 Cal. App. 4th at 154, the personal jurisdiction and forum selection provisions of this clause "must be read jointly," *see Lang v. Skytap, Inc.*, 347 F. Supp. 3d 420, 429 (N.D. Cal. 2018) (citing *Verdugo*, at 154). The personal jurisdiction consent clause therefore also cannot be enforced.

Absent consent, this Court lacks personal jurisdiction over Ms. Bridges. This Court does not have general personal jurisdiction over Ms. Bridges because she does not live in California. Specific personal jurisdiction is also lacking. "For cases sounding in tort, … a defendant has sufficient minimum contacts with the forum state to establish specific personal jurisdiction if:

1    (1) the defendant purposefully directs activities toward the forum state, (2) the plaintiff's claim

2    arises out of or relates to those activities, and (3) an exercise of jurisdiction would be reasonable."

3    *Burri Law PA v. Skurla*, 35 F.4th 1207, 1212 (9th Cir. 2022). The first element, purposefully

4    directing activities to a state, in turn requires that "a defendant: (1) commits an intentional act,

5    (2) expressly aimed at the forum state, that (3) causes harm the defendant knew was likely to be

6    suffered in the forum state." *Id.* at 1213.

7        Here, the complaint does not clearly allege any specific intentional acts by Ms. Bridges

8    that were expressly aimed at California, let alone that Ms. Bridges knew these actions would cause

9    harm in California or that NSP's claims against her arise out of any such actions. Accordingly,

10   NSP has not provided any basis for this Court to exercise specific personal jurisdiction over Ms.

11   Bridges. All claims against Ms. Bridges are therefore dismissed pursuant to Federal Rule of Civil

12   Procedure 12(b)(2) without prejudice to their refiling in an appropriate jurisdiction.

13   **IV.    Maybelline Sana's Motion To Dismiss for Lack of Personal Jurisdiction Is Granted.**

14       Like Ms. Bridges, Ms. Sana lives in Nevada. Unlike Ms. Bridges, Ms. Sana's employment

15   agreement does not purport to contain a California forum-selection clause.[1] Because Ms. Sana is

16   not a California resident and is not alleged to have consented to personal jurisdiction here,

17   personal jurisdiction over Ms. Sana exists here only if NSP's claims arise out of actions taken by

18   Ms. Sana that were expressly aimed at California and likely to cause harm there.

19       NSP alleges several ways its claims relate to California. But all but one are contacts by

20   people other than Ms. Sana that provide no basis for the Court to exercise specific personal

21   jurisdiction over her. For example, NSP asserts in its opposition brief (contrary to the complaint)

22   that it has its "corporate residence" in California, that NSP's "ownership" is in California, that

23   defendants Sameer Padhye, Enlil, and Coligomed are all California residents, and that other

24   defendants (but not Ms. Sana) had California forum-selection clauses in their agreements. None of

25   these allegations demonstrate Ms. Sana's own targeting of this California forum.

26

27

28

The only alleged California contacts that potentially involve Ms. Sana are that the "target [sic] … of the acts complained of were California entities," and that the "conduct of the improper activities was accomplished within California, by Defendant Padhye, working remotely and electronically from there with Defendant Sana." Opposition, Dkt. No. 48, at 14. But these assertions do not identify any specific conduct by Ms. Sana, as opposed to the other defendants, that was targeted toward California. "On a motion to dismiss, the plaintiff has the burden to show that the Court has jurisdiction. *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 741 (9th Cir. 2013). NSP has failed to meet this burden by providing even a prima facie showing of facts suggesting that this Court has specific personal jurisdiction over Ms. Sana. Ms. Sana's motion to dismiss for lack of personal jurisdiction is also therefore granted without prejudice to the refiling of any claims against her in an appropriate forum.

## V.    The Remaining Motions To Dismiss for Failure To State a Claim Are Granted.

The corporate defendants—Enlil and Coligomed—do not challenge this Court's jurisdiction. (The complaint alleges that both operate out of Santa Clara County.) Instead, both companies seek dismissal for failure to state a claim under Rule 12(b)(6). The complaint asserts the same five claims against both Coligomed and Enlil, which are addressed in turn below.

### A.    Tortious Interference

The first claim asserted against Coligomed and Enlil is for tortious interference with a contract. The elements are "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption…; and (5) resulting damage." *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 55 (1998).

NSP's complaint for tortious interference against "all Defendants" is too vague to state a claim. The complaint merely asserts that "Defendants" interfered with NSP's "contracts." Compl. ¶ 80. But it does not specify what contracts were interfered with nor does it clearly allege which defendants interfered and how. The tortious interference claims against both Coligomed and Enlil are therefore dismissed with leave to amend. To survive dismissal, any amended complaint must clearly allege facts supporting each element of a claim against each defendant.

United States District Court
Northern District of California

## B.    Conversion and Conspiracy To Convert

The next two claims asserted against the corporate defendants are for conversion and conspiracy to convert. (Because conspiracy is not a separate cause of action but rather an alternate theory of liability the Court addresses these two claims together.) "The elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages." *Lee v. Hanley*, 61 Cal. 4th 1225, 1240 (2015).

The conspiracy allegations are again vague and conclusory. This claim is again asserted against "all Defendants" without distinction. The property referenced is "Confidential Information, trade secrets, third-party information, and other proprietary information and other … property." Compl. ¶ 83. There are hardly any specific allegations about either Coligomed or Enlil. The complaint simply asserts that each company "acted as a conduit and/or recipient of beneficiary [sic] of improperly obtained … property." Compl. ¶¶ 8–9. The complaint does not identify any particular property that was allegedly converted by either company, nor does it allege any specific act to wrongfully convert any property. Without such allegations, NSP has failed to state a claim, and the conversion and conspiracy claims are dismissed with leave to amend.

## C.    Misappropriation of Trade Secrets

The next claim against the corporate defendants is for misappropriation of trade secrets in violation of the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836. "To succeed on a claim for misappropriation of trade secrets under the DTSA, a plaintiff must prove: (1) that the plaintiff possessed a trade secret, (2) that the defendant misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to the plaintiff." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657–58 (9th Cir. 2020). "To prove ownership of a trade secret, plaintiffs must identify the trade secrets and carry the burden of showing they exist." *Id.* (cleaned up). "Plaintiffs must clearly refer to tangible trade secret material instead of referring to a system which potentially qualifies for trade secret protection. Plaintiffs may not simply rely upon 'catchall' phrases or identify categories of trade secrets …." *Id.* (cleaned up).

NSP's misappropriation claim does not meet this requirement. The trade secrets identified

34

in the complaint are "vendor and partner information, proprietary formulas, business processes, pricing strategies, pricing data, marketing methods, other data, computer and software processes and systems …, and more." Compl. ¶ 88. These descriptions do not clearly refer to tangible trade secret material as required. Instead, they are "catchall" categories of the *kinds* of trade secrets that might be at issue. This claim is deficient and is similarly dismissed with leave to amend. In any amended complaint, NSP must identify the specific material alleged to constitute a trade secret (under seal if necessary) and clearly allege facts showing the Coligomed or Enlil took actions that constituted misappropriation.

### D. Unfair Business Practices

The final claim asserted against Coligomed and Enlil is for committing alleged unfair business practices in violation of California's Unfair Competition Law (UCL), Bus. & Prof. Code § 17200 *et seq*. The complaint asserts that "all Defendants … engaged in behavior which was unlawful, unfair, and fraudulent," and which "was also deceptive, untrue, and misleading." Compl. ¶ 95. These barebones allegations do not identify any specific actions taken by Coligomed or Enlil that is alleged to have violated the UCL. The allegations are conclusory and deficient under Rule 8. This claim is therefore dismissed with leave to amend.

## VI. Conclusion

Defendants' motions to dismiss are granted for the reasons set forth above. Because the Court does not have personal jurisdiction over Ms. Bridges or Ms. Sana, these defendants are dismissed from this action. NSP may file an amended complaint to attempt to resolve the shortcomings identified above in its claims against Coligomed and Enlil. An amended complaint, should NSP choose to file one, will be due June 3, 2024.

**IT IS SO ORDERED.**

Dated: May 16, 2024

P. Casey Pitts
United States District Judge

United States District Court
Northern District of California

35

**EXHIBIT C**

Transcript Excerpt from National Specialty Pharmacy, LLC v. One Way Drug, LLC,

Case No. 2:21-cv-01082-JAD-VCF (D. Nev. Sept. 28, 2021)


Portions cited: Pages 19–21, related to dismissal of DTSA claim for lack of interstate commerce

nexus.

2:21-cv-01082-JAD-VCF - September 28, 2021

```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF NEVADA

 3    NATIONAL SPECIALTY PHARMACY, )
      LLC and GIVING HOME          )
 4    HEALTHCARE, LLC,             )
                                   ) Case No. 2:21-cv-01082-JAD-VCF
 5               Plaintiffs,       )
                                   ) Las Vegas, Nevada
 6    vs.                          ) September 28, 2021
                                   ) 11:01 a.m. - 11:34 a.m.
 7    ONE WAY DRUG LLC dba PARTELL ) Courtroom 6D
      PHARMACY, ADVANCED CARE GROUP) MOTION HEARING
 8    LLC aka ADVANCED CARE GROUP  )
      HOME HEALTH AGENCY, and      )
 9    WILLIAM TILGHMAN,            )
                                   )
10               Defendants.       )
      _____)  CERTIFIED COPY

11

12       REPORTER'S TRANSCRIPT OF PROCEEDINGS CONDUCTED VIA ZOOM
                BEFORE THE HONORABLE JENNIFER A. DORSEY
13                UNITED STATES DISTRICT COURT JUDGE

14

15    APPEARANCES:

16    For the Plaintiffs: ALLISON L. KHEEL, ESQ.
                          FISHER & PHILLIPS LLP
17                        300 South Fourth Street, Suite 1500
                          Las Vegas, Nevada 89101
18                        (702) 252-3131

19

20    (Appearances continued on page 2.)

21    Court Reporter:     Amber M. McClane, RPR, CRR, CCR #914
                          United States District Court
22                        333 Las Vegas Boulevard South, Room 1334
                          Las Vegas, Nevada 89101
23                        (702) 384-0429 or AM@nvd.uscourts.gov

24    Proceedings reported by machine shorthand.  Transcript
      produced by computer-aided transcription.
25
```

```
 1   APPEARANCES CONTINUED:

 2   For the Defendants One Way Drug, LLC and William Tilghman:

 3        JONATHAN W. HEATON, ESQ.
          HEATON FONTANO, LTD.
 4        7285 Dean Martin Drive, Suite 180
          Las Vegas, Nevada 89118
 5        (702) 329-9901

 6   For the Defendant Advanced Care Group, LLC:

 7        TIMOTHY ELSON, ESQ.
          THE LAW OFFICES OF TIMOTHY ELSON
 8        8965 South Eastern Avenue, Suite 382
          Las Vegas, Nevada 89123
 9        (702) 874-8600

10                       * * * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        LAS VEGAS, NEVADA; TUESDAY, SEPTEMBER 28, 2021; 11:01 A.M.

 2                            --o0o--

 3                    P R O C E E D I N G S

 4        COURTROOM ADMINISTRATOR:  Now's the time set for a

 5   motions hearing in Case Number 2:21-cv-1082-JAD-VCF, National

 6   Specialty Pharmacy, LLC versus One Way Drug, LLC.

 7        Counsel, please state your appearances.

 8        MR. HEATON:  Yes.  Jonathan Heaton on behalf of

 9   defendants Partell Pharmacy and William Tilghman.

10        MS. KHEEL:  Allison Kheel on behalf of the plaintiffs

11   National Specialty Pharmacy and Giving Home Healthcare.

12        MR. ELSON:  Good morning, Your Honor.  This is Tim

13   Elson appearing on behalf of Advanced Care Group.

14        THE COURT:  All right.  Well, good morning.  In this

15   action plaintiffs National Specialty Pharmacy -- oh.  Sorry.

16     (Reporter interruption.)

17        THE COURT:  Sorry about that.  We'll start over.

18   Yeah.  We're having, like, weird sound things going on here in

19   the courtroom so I apologize, but I can see and hear all of

20   you.  So if you can hear me and see me, then I think we're

21   okay.

22        So in this action plaintiffs National Specialty

23   Pharmacy and Giving Home Healthcare, a local compounding

24   pharmacy and a home health care company, sue their former

25   employee, William Tilghman, and his new employers, One Way
```

1    Drug d/b/a Partell Pharmacy and Advanced Care Group, LLC,

2    alleging that Tilghman took his company laptop and secret

3    client list and trade secrets with him and is using them in

4    his new employment.

5            The plaintiffs assert 12 claims, ten of which are

6    state law claims and two of which attempt to state federal

7    claims to anchor jurisdiction here.

8            All defendants move to dismiss.  These motions are

9    found at Numbers 19, 22, and 28 in the docket.  They raise

10   essentially the very same arguments.  The primary argument is

11   that this court lacks subject matter jurisdiction over this

12   case because the plaintiffs do not and cannot state their

13   federal claims so this Court should dismiss the federal claims

14   without leave to amend and then decline to exercise

15   supplemental jurisdiction over the remaining state law claims

16   essentially forcing the plaintiffs to refile in state court.

17   The plaintiffs oppose the motions.

18           The motions are fully briefed.  I have read

19   everything, and I fully understand the arguments.  I am going

20   to allow each side ten minutes of argument.

21           So let me ask the defendants.  I see, Mr. Heaton and

22   Mr. Elson, you are both here.  Your arguments are entirely

23   overlapping.  Advanced Care's arguments are essentially

24   Partell's arguments.  Do you -- do you intend only one of you

25   will argue today, or do you require separate arguments?

```
1         MR. HEATON:  Your Honor, I think, if it's okay with
2    the Court, I would take the lead on the argument.  And then,
3    if Mr. Elson had anything to add at the very end, if we have a
4    minute or two left, that maybe he could chime in at that
5    point.
6         THE COURT:  All right.  Perfect.
7         So I'm going to allow each side ten minutes for
8    argument.  And I will allow -- Mr. Heaton, I will allow you to
9    reserve up to three minutes of that for rebuttal.  And
10   actually, you know what?  Since we do have three different --
11   so if you could just reserve some of your arguments -- or
12   argument time for Mr. Elson if he needs to add anything, but I
13   think that the arguments truly are overlapping.
14        So all -- would you -- how -- let me try that again.
15   Mr. Heaton, how long would you like me to reserve for your
16   rebuttal, up to three minutes?
17        MR. HEATON:  Let's reserve two minutes --
18        THE COURT:  Okay.
19        MR. HEATON:  -- for rebuttal.
20        THE COURT:  All right.  I'm going to put eight
21   minutes on the clock.
22        And whenever you are ready.
23        MR. HEATON:  Okay.  Thank you, Your Honor.  I
24   appreciate that.
25        As Your Honor mentioned, you know, if you've read the
```

1    briefing -- and I think we've fully briefed these arguments --

2    you know, we think that this case ought to be dismissed in its

3    entirety for lack of subject matter jurisdiction.  You know,

4    the non-Tilghman defendants -- defendants, I guess, also have

5    some additional failure to state a claim arguments, but I

6    think the crux of our arguments really is the subject matter

7    jurisdiction argument; that the plaintiffs have not and cannot

8    properly pled their entitlement to federal question

9    jurisdiction under these two statutes:  The Defend Trade

10    Secrets Act and the Computer Fraud and Abuse Act -- Computer

11    Fraud Abuse Act.

12         You know, we think that the two out of ten causes of

13    action in the complaint that they allege are really tangential

14    at best to the -- to the overwhelming substance of the

15    complaint which -- which arises under state law.  We think

16    that, you know, the true motivation in all of this is to try

17    to get the defendants to be here in Federal Court, and while

18    we -- you know, we of course respect Your Honor and respect

19    the Federal Court, you know, we really do think that these are

20    state law issues that are better litigated in state court, if

21    they need to be litigated at all.  And we, of course, dispute

22    whether they do or not.  But for purposes of today, you know,

23    we would -- we would just say that, you know, to the extent

24    that there is any merit to the claims, they ought to go to --

25    into state court.

1        So the crux of our position and argument is really

2  that both of the statutes at issue have these key interstate

3  commerce components to them, and -- and plaintiffs haven't

4  pled anything that we think would satisfy that interstate

5  commerce component under sort of a facial analysis of -- of

6  their complaint.

7        And then, in Mr. Tilghman's motion to dismiss, which

8  was the latest of the three that's before the Court, we also

9  were able to provide some additional support by way of

10  declaration of Mr. Tilghman, you know, as a factual matter

11  showing that we really -- we really don't believe that, even

12  if plaintiffs were given leave to amend, that they would be

13  able to amend their complaint in such a way that would fix the

14  defect on the interstate commerce issue because the facts just

15  simply won't support it.

16        You know, we think under both analyses, both the

17  facial and the factual analysis, that the -- you know, the

18  causes of action pled in the complaint fail as a matter of

19  law.  And once those are dismissed, there's really no longer

20  any compelling reason for this Court to retain the state law

21  claims.

22        So, you know, if I could just for a couple minutes,

23  you know, just address each of the statutes in question.  You

24  know, as to the DTSA or the Defend Trade Secrets Act,

25  Your Honor, I think where the plaintiffs are really missing

 1    the point is that the plain language of that statute requires

 2    a connection or nexus between the trade secret at issue and a

 3    product or service being used in interstate commerce.  And,

 4    you know, the plaintiffs have tried to identify various ways

 5    in which they have some tangential relationship to interstate

 6    commerce.  You know, they said, oh, we have some suppliers,

 7    you know, in our compounding pharmacy that produce -- you

 8    know, that send us components for some of these -- these drugs

 9    that we, you know, compound.  And they say, oh, one of our

10    parties is actually a Delaware entity; right?  And so there

11    are some of these things that they're -- you know, they're

12    trying to meet this interstate commerce requirement.

13           But what they can't say and what they haven't said is

14    that they are providing services to the subject population

15    which -- of these patients, which are the trade secret at

16    issue; right?  They're saying that Mr. Tilghman took their

17    patient lists and that these parties -- these defendant

18    parties are acting in concert to, you know, sort of take these

19    patients.  They can't say that any of that is occurring, you

20    know, out of state.  They can't say that they are providing

21    the subject patients with services out of state.  They can't

22    say that Partell Pharmacy is providing services to these

23    patients out of state.  And so really the trade secret at

24    issue is entirely within Nevada.  It's not -- it has nothing

25    to do with anything out of state.

```
1              And even Mr. Tilghman's noncompete, I think, as we
2     reference in the briefing, you know, itself indicates that
3     it's -- it's a 5-mile radius, right, is where he's not allowed
4     to compete if you accept, you know, that agreement and -- and
5     use that as the analysis.  And the last time I checked, you
6     know, 5 miles doesn't get you to the state line of Nevada;
7     right?
8              And so -- so we really don't -- we haven't -- we
9     haven't been able to find anything in the Ninth Circuit or
10    directly binding on this Court that really squarely addresses
11    this issue.  But I think, Your Honor, we did try in the
12    briefing to provide some good cases that are from other
13    jurisdictions, other Federal District Courts, and we think
14    that they have considered this issue and they've come up with
15    some reasonable analysis, and they've -- and they've found
16    that it's an important -- that it's -- it's -- there are
17    reasons why we have the interstate commerce components of
18    these federal statutes; right?  And to not require that
19    plaintiffs address that would be to render those components of
20    these statutes meaningless.
21             And so -- so we think that those cases address and
22    reject most of the plaintiffs' arguments -- really, all of the
23    plaintiffs' arguments in this case, and that this Court would
24    be on firm footing and reasonable footing to -- to adopt sort
25    of that same analysis and force the plaintiffs to -- you know,
```

2:21-cv-01082-JAD-VCF - September 28, 2021

1    to force these things to be dismissed here as well.

2         So, you know, I guess, to sum up, you know, we think

3    that the plaintiffs' position would render the interstate

4    commerce component of these statutes meaningless, and we

5    respectfully think that there's a reason why those components

6    of the statutes exist and it would be bad precedent to allow

7    parties to come into this court and argue, you know,

8    essentially as plaintiffs are, that in almost every

9    conceivable case a party can satisfy interstate commerce under

10   the DTSA just by having some unrelated dealings, you know, out

11   of state or have some kind of general -- you know, generic

12   federal funding or regulation, you know, applicable to them as

13   an entity.  We just -- we just think that those arguments are

14   a little bit absurd.

15        As to the -- as to the Computer Fraud and Abuse Act,

16   Your Honor, I think -- I think this one really almost speaks

17   for itself even better than the DTSA just because, again, you

18   know, the plaintiffs appear to want to say that essentially

19   every computer in today's world is a protected computer under

20   that statute, and we just respectfully disagree.  You know,

21   plaintiffs don't appear to care how the computer was actually

22   used or whether it was used.  They're essentially saying that,

23   you know, the mere fact of it having the Internet connection

24   alone satisfies interstate commerce, and thus, you know,

25   essentially every computer in today's world is a protected

1    computer.  And we just don't think that's a reasonable

2    argument.

3            And we don't think it's -- we similarly don't think

4    it's a reasonable argument that, you know, any purported

5    improper use of a laptop, which we dispute as a factual

6    matter, could have run afoul of the Atomic Energy Act and --

7    and that, you know, these -- that somehow Partell and/or the

8    other defendants were doing this, you know, with the

9    expectation that it's going to be used by enemies of the

10   United States.  You know, we just don't think that that's a

11   reasonable argument.

12           And so, you know, in conclusion, Your Honor, I would

13   just say, you know, we're asking that the Court dismiss this.

14   You know, there was some back-and-forth in the briefing about

15   what we were asking for.  We're asking that this entire action

16   be dismissed.  We think, once these two federal causes of

17   action are dismissed, that the relevant case law around

18   supplemental jurisdiction would -- would also compel this

19   Court to dismiss the remaining claims.  And it's not -- we

20   don't believe it's prejudicial to plaintiffs.  We just think

21   they shouldn't have come here in the first place.  If they

22   want to file their complaint -- their complaint, they can do

23   it in state court and we can litigate there.

24           And with that, Your Honor, I would turn it over.

25   Thank you.

1          **THE COURT:**  Thank you.

2          Mr. Elson, I'll give you -- I'll add three more

3    minutes if you have something that you want to add.

4          **MR. ELSON:**  Thank you, Your Honor.  And I'll --

5          **THE COURT:**  Hold on.  Give me one second just to put

6    that on the clock.

7          Go ahead.

8          **MR. ELSON:**  Yes, Your Honor.  And I'll -- I'll make

9    sure and keep it brief because I think largely the filings we

10   submitted to this Court highlights the deficiencies with the

11   pleadings.

12         And the one thing I want to focus on is the request

13   for leave to amend and the fact that these deficiencies can't

14   be cured by any request for leave to amend.  And how do we

15   know this, Your Honor?  Well, first, there's no pleading

16   attached in direct contradiction of Local Rule 15-I(a).  So

17   plaintiffs haven't bothered to show how they can cure it.

18   There's case law out there that cites that -- that states that

19   a court cannot determine if leave to amend is appropriate

20   without the proposed pleading.  And even if this Court were to

21   not strictly enforce those rules -- which we believe you

22   should -- they haven't even stated in their moving papers what

23   fact they would plead to overcome these blatant deficiencies

24   with the jurisdiction before this Court.

25         And they didn't just do it once.  They missed the

2:21-cv-01082-JAD-VCF - September 28, 2021

1   opportunity three times, and they missed the opportunity on

2   the third time even -- or, actually, twice.  After I pointed

3   all of this out in my motion, they still filed two oppositions

4   without a proposed pleading and without setting forth any

5   specific facts in the moving papers.  And so I think that if

6   there's any doubt in Your Honor's mind about whether to simply

7   dismiss, the -- their actions should make it clear to this

8   Court that dismissal is the appropriate remedy here today.

9           And so unless Your Honor has any questions, I will

10  pass the briefing -- or pass the argument at this time.

11          **THE COURT:**  All right.  Thank you.

12          Ms. Kheel, I'm going to put 12 minutes on the clock

13  for you since I gave the other side an extra two minutes.

14          Whenever you're ready.

15          **MS. KHEEL:**  Thank you, Your Honor.

16          So we're here today on a motion to dismiss, and the

17  crux of this is they need to show that we both do not and

18  cannot state federal jurisdiction.  And we believe we've done

19  both.

20          We are not required under the rules to use any types

21  of magic words as long as it can be determined from the

22  allegations in the complaint that federal jurisdiction has

23  been established.  And they make a lot of arguments about how

24  these trade secrets aren't related in any way to interstate

25  commerce, and this is a tenuous argument at best.

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914     *Page 13*

2:21-cv-01082-JAD-VCF - September 28, 2021

1          Essentially --

2          *(Phone interruption in the proceedings.)*

3          **MS. KHEEL:**  Sorry, Your Honor.

4          Essentially where we're at is our clients have

5     confidential, HIPAA protected health information about

6     critically ill, vulnerable, elderly patients.  All of these

7     patients are participants in a Federal Government program and

8     are receiving reimbursement for their claims for medications,

9     for services, for home health care through the DEEOICP, which

10    is a DOL-based program through the Department of Energy for

11    Department of Energy workers who worked at nuclear test site

12    facilities or are currently employed by nuclear test site

13    facilities.

14          It is a very lucrative program, and that is why

15    defendants are interested in the benefits to begin with.

16    These are federally run programs.  The reimbursement comes

17    federally through interstate commerce.  These are claims filed

18    by people in multiple states, and by our state they go through

19    the federal program.  They travel interstate.  These are also

20    reimbursements for prescription drugs, and the prescription

21    drugs, most of the compounds that are being used are supplied

22    interstate.  And, therefore, there really is a clear

23    connection, and we believe that connection is demonstrated

24    thoroughly in the pleadings.

25          And to address Mr. Elson's point, we believe that it

1    was sufficiently pled in the complaint.  The complaint is very

2    lengthy and created -- and contained sufficient and

3    significant detail of all the programs and what was undertaken

4    with that and what these people have to file.  So the fact

5    that we didn't file a proposed amended pleading is because we

6    did not believe that we needed to because we believe that the

7    complaints and allegations in the complaint are sufficient to

8    establish federal question jurisdiction.

9            We're talking about trade secrets under the Defend

10   Trade Secrets Act.  First and foremost, that's the heart of

11   this.  That's the heart of these claims.  And, yes, the Defend

12   Trade Secrets Act does overlap significantly with the Nevada

13   Uniform Trade Secrets Act.  The language is almost identical.

14   That doesn't mean that we don't have a claim under the Defend

15   Trade Secrets Act.  We've shown that these trade secrets that

16   we are trying to protect, this confidential information about

17   customers, what benefits they get, what reimbursements they

18   get, what prescriptions they get is essential and it meets the

19   test for a trade secret under the Defend Trade Secrets Act.

20           In terms of the Computer Fraud and Abuse Act, it is

21   very telling that the plaintiffs here have -- or the

22   defendants here have refused plaintiffs' offer to -- we

23   contacted plaintiffs -- or we con -- we, the plaintiffs,

24   contacted the defendants to offer them some kind of discovery

25   protection so that we could secure the return of our computer

1   and so that we could stop what was blatant misappropriation

2   and access of our computer, and they refused.  Mr. Seik, who

3   is the owner and managing member of Partell, specifically said

4   to us that they were going to keep doing what they were doing

5   because they didn't have a contract and they didn't believe

6   that anything that they were doing was wrong.  And they have,

7   to date, refused to return our property, our protected

8   computer.

9           So to the extent that they believe, oh, we're going

10  to now submit a declaration from Mr. Tilghman saying I haven't

11  accessed the computer, without the computer, we cannot verify

12  one way or other.  That's why we are here.  We believe he has

13  accessed it.  We believe he is using this information.  And

14  the computer has information on it that specifically pertains

15  to prescription drug information that is made from compounds

16  that travel interstate.  Prescriptions have been delivered to

17  our patients out of state.  And we believe that if the Court

18  finds it necessary for us to add those allegations

19  specifically into the complaint, we're happy to do so,

20  although we don't feel that it is necessary here.

21          Additionally, there's no Ninth Circuit or binding

22  authority requiring dismissal here.  Dismissal is not the

23  answer.

24          Also, he may have accessed information through his

25  cell phone which is -- also would have been transferred

2:21-cv-01082-JAD-VCF - September 28, 2021

1    interstate and would have been a product that, you know, is an
2    additional protected computer and protected device.  And he
3    has contact information for patients.  And if he's ever
4    traveled interstate, which we believe that he has, and ever
5    had his cell phone with him, then that additionally shows
6    interstate commerce connections.
7            And I'll open it up for questions from the Court.
8            **THE COURT:**  I don't have any.  Thank you so much.
9            **MS. KHEEL:**  Okay.  Thank you, Your Honor.
10           Mr. Heaton, two-minute rebuttal.
11           **MR. HEATON:**  Thank you, Your Honor.
12           There was a lot there, and I tried to take some
13   notes.  What I would say is, you know, first of all, you know,
14   this notion that we had to meet some kind of a showing here,
15   the case law is pretty definitive that plaintiffs have the
16   burden to establish subject -- subject matter jurisdiction.
17   They're the ones, under the Ninth Circuit binding precedent,
18   that have to come in here and show the Court why there's a
19   true federal question and how they have subject matter
20   jurisdiction.  We don't believe they've done that.  We don't
21   believe they can do that.
22           I would also -- you know, I'd just like to address
23   this notion of -- that -- that plaintiffs, you know, should
24   fall under the -- the interstate commerce -- they meet the
25   interstate commerce requirement because of the -- you know,

1    the fact of there being a federally funded -- involved in a

2    federally-funded program.  And I would just turn the Court's

3    attention to *DLMC, Inc. versus Flores*, and that's out of the

4    District of Hawaii.  Again, we acknowledge not binding; right?

5    But we think it's a very thoughtful case, and I'll just read a

6    little bit from that case.

7         It says:  The plaintiffs' only argument in support of

8    the existence of the required nexus is that all plaintiffs'

9    clients, including the ones defendants are accused of taking,

10   have federal patient identification numbers so as to allow for

11   their receipt of federal funds for the services provided to

12   them by plaintiff.  Plaintiff also asserts that plaintiff is

13   an entity whose very existence relies on and is conditioned

14   upon federal application, certification, and approval.

15   Federal -- plaintiffs' services are subject to federal law

16   relating to federal funds.  These allegations beg the question

17   of whether and how the trade secrets defendants are alleged to

18   have misappropriated are somehow related to the provision of

19   interstate services offered by plaintiff.  These dots are

20   neither connected in the complaint nor in any of plaintiffs'

21   other submissions to the Court and, indeed, it appears the

22   plaintiff does not offer any interstate services.  The same is

23   true with regard to defendants.

24        And the Court goes on to say that, you know, the

25   Court can't conclude that interstate commerce is met just by

```
 1   some of these tangential matters.
 2          I would say just -- just quickly, you know, I can't
 3   address the substance of the facts, but I would say ECFs 34
 4   and 36 do address a number of those facts.  It's in a pending
 5   motion before the magistrate judge, and I would invite the
 6   Court to review those if there are questions as to the laptop
 7   computer and so forth.
 8          Thank you, Your Honor.
 9          THE COURT:  Thank you.
10          Anything else to add, Mr. Elson?
11          MR. ELSON:  Sorry, Your Honor.  I was on mute.  No,
12   Your Honor.  I'll submit on the briefings unless Your Honor
13   has any direct issues that you'd like me to address.
14          THE COURT:  I don't.  Thank you very much.
15          All right.  Well, thank you, all, for your briefing
16   and your arguments.  It is my intention to rule on this motion
17   on the record today.  So I will place my findings and
18   conclusions on the record.  The transcript of this hearing
19   will serve as the record of my findings and conclusions, and I
20   will not be entering a separate written order.
21          I'm going to jump right to these federal claims
22   because they are the crux of this argument.  The first is
23   Count 8, violation of the Computer Fraud and Abuse Act, Title
24   18 United States Code § 1030 et seq.  It's asserted against
25   all three defendants.  This claim centers on Tilghman's
```

 1    retained company laptop, but I find this statute just doesn't
 2    cover this very local and limited situation that we have pled
 3    here.
 4          This act was designed to outlaw conduct that
 5    victimizes computer systems.  It's essentially a cyber
 6    security law that protects computers belonging to financial
 7    institutions or the Federal Government generally.  For a
 8    computer to trigger a claim under this statute, it basically
 9    must belong to the Federal Government or be used in interstate
10    or foreign commerce or communication or banking.  There are no
11    allegations in the complaint that would suggest that this
12    computer was used in interstate or foreign commerce, and the
13    plaintiffs haven't identified true facts they could allege
14    that I think would satisfy this requirement.
15          I'm not persuaded by the argument that the computer
16    was used in interstate or foreign commerce by virtue of the
17    fact that it could connect to the Internet.  Were that the
18    case, every modern computer would be covered by this otherwise
19    narrow act and supply federal jurisdiction to a wide swath of
20    very local activity.
21          Plaintiffs argue that even if the computer itself
22    doesn't qualify, the client and customer list do because the
23    information there is about customers who receive benefits
24    under a federal program implemented by the Division of Energy
25    Employees Occupational Illness Compensation Program, and they

2:21-cv-01082-JAD-VCF - September 28, 2021

1    claim that this is "restricted data" -- quotes around that

2    term, restricted data -- which is a defined term under the

3    Atomic Energy Act.  They say that -- they argue that that is

4    what it is protected under.

5         I find this is just too great a stretch here.  The

6    language of the statute simply does not support it.  It also

7    requires that the restricted data be communicated, quote,

8    "with reason to believe that such information could be used to

9    the injury of the United States, or to the advantage of any

10   foreign nation."  And these facts just don't even come close.

11   So I grant the motion, and I dismiss Count 8.

12        The second federal claim is Count 10, alleging a

13   violation of the Defend Trade Secrets Act, Title 18 United

14   States Code § 1831 et seq.

15        This claim alleges that Tilghman took the plaintiffs'

16   trade secrets for his own benefit and "potentially" -- in

17   quotes, potentially -- the benefit of Partell and Advanced.

18   This statute applies to trade secrets, quote, "related to a

19   product or service used in, or intended for use in, interstate

20   or foreign commerce."  So it's not that the company has to be

21   doing foreign commerce in some other way, like getting

22   supplies through the stream of commerce or getting reimbursed

23   through a stream of commerce.  The focus is on whether the

24   product or service is used in or intended for use in

25   interstate or foreign commerce.  That's the language of the

1    statute.  It's § 1836(b)(1).  The plaintiffs have made no

2    attempt to allege this nexus for their trade secrets and their

3    product, and they have not demonstrated that they can if given

4    leave to amend.

5         Their businesses are very local.  They serve the

6    local community.  They do business as a local compounding

7    pharmacy with a single Nevada location and a home health

8    services company that services the local community.  Although

9    NSP is a Delaware company, the statute focuses on products,

10   not entities.  And even if NSP gets its compounding

11   ingredients through interstate commerce, the trade secretes

12   that it sues over aren't related to a product or service used

13   in or intended for use in interstate or foreign commerce, as

14   the statute requires.  The trade secrets relate to the

15   customer list and information.

16        The plaintiffs argue that because some of their

17   clients are entitled to benefits through a federal program

18   implemented by the Division of Energy Employees Occupational

19   Illness Compensation Program, that provides the nexus needed.

20   I don't find this argument persuasive because the products and

21   services that the defendant -- or that the plaintiffs offer

22   still aren't used in or intended to be used in interstate

23   commerce.  There's just no allegations to support that.

24   There's no additional information provided in the oppositions

25   that would support that.  I find this to be essentially

1    similar to the *Flores* case, that Hawaii case that counsel just

2    read from during rebuttal and which is contained in the

3    briefing.

4            So I dismiss this claim without prejudice but also

5    without leave to amend because I can't conclude that, if given

6    leave to amend, the plaintiffs could state true facts to

7    support this nexus.  The plaintiffs also have not offered a

8    proposed amended complaint as Local Rule 15-I requires.  But

9    more importantly, they don't identify facts in their

10   oppositions that would support leave to amend -- even liberal

11   leave to amend as the Ninth Circuit requires.

12           So, in sum, I certainly give the plaintiffs' counsel

13   credit for some novel and creative arguments and claims, but

14   I'm afraid they just don't carry the day here.  This appears

15   to me to be a very state-law based case, and so I dismiss both

16   of the federal claims that anchor this case here with federal

17   question jurisdiction.

18           Having dismissed those federal claims, I turn to the

19   state-law claims.  Federal courts are courts of limited

20   jurisdiction, and they may exercise supplemental jurisdiction

21   over state-law claims that are, quote, "so related to claims

22   in the action," end quote, that they form the same case or

23   controversy with the claims over which the Court has

24   jurisdiction.  We know that that's 28 United States Code

25   § 1367(a).  But once a plaintiff's federal claims have been

```
 1    dismissed, the Court may decline to exercise supplemental

 2    jurisdiction over remaining state-law claims under 28 United

 3    States Code § 1367(c)(4).  And, in fact, in the Ninth Circuit

 4    case, Harrell versus 20th Century Insurance Company, the

 5    Ninth Circuit said it's generally preferable for a District

 6    Court to remand -- here it would be dismiss -- remaining

 7    supplemental jurisdiction claims so that they go back over to

 8    state court or go over to state court in the event that they

 9    started in Federal Court.

10            And because I have dismissed both federal claims, I

11    decline to exercise supplemental jurisdiction over the

12    remaining state-law claims.  So I dismiss them without

13    prejudice to the plaintiffs' ability to refile them in state

14    court.

15            So I don't reach, as I don't need to reach, the

16    remaining arguments in the parties' briefing.

17            And, finally, I'm denying as moot the motion to stay

18    discovery that is in the record at Number 34 because the

19    dismissal of this case just moots that issue.

20            Any questions?  I'll ask plaintiffs' counsel first.

21        MS. KHEEL:  (Shakes head from side to side).

22    No, Your Honor.

23        THE COURT:  Thank you.

24    Defense counsel?  Mr. Heaton?

25        MR. HEATON:  No, Your Honor.  Thank you.
```

2:21-cv-01082-JAD-VCF - September 28, 2021

1          **THE COURT:**  Mr. Elson?

2          **MR. ELSON:**  No, Your Honor.  Thank you.

3          **THE COURT:**  All right.  Thanks, everyone.  Have a

4     good day.  We're adjourned.

5          *(Proceedings adjourned at 11:34 a.m.)*

6                         --o0o--

7                 COURT REPORTER'S CERTIFICATE

8

9          I, AMBER M. McCLANE, Official Court Reporter, United

10    States District Court, District of Nevada, Las Vegas, Nevada,

11    do hereby certify that pursuant to 28 U.S.C. § 753 the

12    foregoing is a true, complete, and correct transcript of the

13    proceedings had in connection with the above-entitled matter.

14

15    DATED:  10/21/2021

16

17          /s/_____*Amber M. McClane*_____

18              AMBER McCLANE, RPR, CRR, CCR #914

19

20

21

22

23

24

25