# EXHIBIT 1

Declaration of Sanjiv Dhawan

1  **HONE LAW**
Jennifer W. Arledge, NV Bar No. 8729
2  jarledge@hone.law
Kelly B. Stout, NV Bar No. 12105
3  kstout@hone.law
701 N. Green Valley Parkway, Suite 200
4  Henderson, NV 89074
Phone  702-608-3720
5  Fax      702-608-7814
6
Nitoj P. Singh, CA Bar No. 265005*
7  nsingh@dhillonlaw.com
Anthony J. Fusaro, Jr., CA Bar No. 345017*
8  afusaro@dhillonlaw.com
DHILLON LAW GROUP INC.
9  177 Post Street, Suite 700
San Francisco, CA 94108
10  Phone  415-433-1700
Fax      415-520-6593
11  *Admitted Pro Hac Vice*
12
*Attorneys for Plaintiff*
13  NATIONAL SPECIALTY PHARMACY LLC

14                UNITED STATES DISTRICT COURT
15
                     DISTRICT OF NEVADA
16

| | |
|---|---|
| 17 NATIONAL SPECIALTY PHARMACY LLC, | Case No. 2:25-cv-00295-CDS-MDC |
| 18                                  Plaintiff, | **DECLARATION OF SANJIV DHAWAN IN SUPPORT OF PLAINTIFF NATIONAL** |
| 19 vs. | **SPECIALTY PHARMACY LLC'S OPPOSITION TO DEFENDANT SANA'S** |
| 20 MAYBELLINE SANA, an individual; RAYNE BRIDGES, an individual; and | **MOTION TO DISMISS / MOTION FOR SUMMARY JUDGMENT** |
| 21 DOES 1 to 49, inclusive, | |
| 22                                  Defendants. | |

23
24
25
26
27
28



1

**DECLARATION OF SANJIV DHAWAN**

I, Sanjiv Dhawan, hereby declare as follows:

1.      I am the CEO of Plaintiff National Specialty Pharmacy, LLC ("NSP"), am competent to testify as to the matters below, and make the following statements based on personal knowledge and information or based on my review of the books and records of NSP.

2.      NSP is a compounding pharmacy that's business is to provide various life-saving drugs and durable medical equipment to patients primarily in Nevada, with patients in 16 other states.

3.      Its business focuses on serving patients holding Pharmacy Benefits Cards issued by the U.S. Department of Labor, also known as "White Cards." The White Card program is obscure and not widely pursued by other pharmaceutical companies. NSP spent seven years of labor and significant capital investment to obtain approval for and develop its White Card business, which encompasses the development, compounding, marketing, and sale of pharmaceuticals and other medical products, including those under government contracts.

4.      The end result of NSP's labor and financial investment are databases (the "Databases") that stored, inter alia, complex patient information, including, but not limited to, patient name and contact information, the patient's diagnosis and pharmaceutical purchase history, medical provider (including type of medical provider), and how long they had been in the White Card program. As NSP marketing efforts were primarily targeted at referring medical providers, the database allowed users to sort by medical providers, and ascertain how much NSP business was associated with each medical provider. In the wrong hands, the Database would allow competitors to quickly and easily target NSP's biggest revenue sources.

5.      The information in the Database was not easily or publicly accessible, and collected and organized only through NSP's significant and costly efforts over an extended period of time. The Database was encrypted, and access was severely limited through passwords. Given the sensitivity of the Database, it also tracked user activity on the Database, and IP addresses associated with such activity.

6.      In addition, NSP developed a customer resource management system ("CRM")

1   using the platform Monday.com, which organizes information from the Databases and presents it

2   in a user-friendly manner.

3       7.      To comply with industry law and regulation, including the Health Insurance

4   Portability and Accountability Act ("HIPAA"), NSP invested heavily in security measures to

5   protect its proprietary information, including encryption, password protection, physical security,

6   legal review, and binding written agreements for employees with confidentiality and nondisclosure

7   provisions. The confidentiality of NSP's proprietary processes and information is crucial to its

8   success—if its competitors accessed this information, they could duplicate NSP's products, target

9   its patients and business partners, and capture its market share.

10      8.      A list of NSP's trade secrets NSP contends were misappropriated by Defendant

11  Maybelline Sana ("Sana") are attached hereto as Exhibit A.

12      9.      Defendant Sana began her employment with NSP as a pharmacy technician on May

13  21, 2018, and was later promoted to Director of Operations and Human Resources in the Fall of

14  2022. When Sana was hired, she signed an employment agreement (the "Agreement"), a true and

15  correct copy of which is attached hereto as Exhibit B. Sana also goes by the name "Maybelline

16  Ash," and has signed documents under that name. During her tenure, Sana worked closely with

17  Sameer Padhye ("Padhye"), NSP's former Chief Strategy Officer.

18      10.     Padhye, as Chief Strategy Officer of NSP, was entrusted to develop new lines of

19  business for NSP. Instead, Padhye shirked his NSP duties in favor of a competing venture Taycann

20  LLC, doing business as Taycann Wellness. Upon information and belief, Padhye's plan was to

21  compete with NSP in the White Card space, and used NSP's trade secret and confidential

22  information to develop Taycann's business. Padhye's conduct is the subject of a related case in the

23  Northern District of California.

24      11.     Taycann was incorporated in California in 2022, and, upon information and belief,

25  beginning at least as early as February 2023, Padhye began to develop Taycann as a competitor to

26  NSP. Attached hereto as Exhibit C is a true and correct copy of the Articles of Organization for

27  Taycann. Around this time, Sana and Padhye began accessing and saving NSP data wholly

28  irrelevant to their work. For example, on February 28, 2023, Sana sent Padhye NSP's master

Docusign Envelope ID: BCD19348-AF66-49B3-BC8F-AE5B9D855D61

patient list—information neither of them needed to fulfill their job duties; on March 29, 2023, Sana sent Padhye a summary of NSP's prescriptions filled in June 2017—again irrelevant for their official duties, but informative to a competitor; and on April 27, 2023 Sana sent Padhye a list of all prescriptions NSP filled between 2016 and 2017, with personally identifiable information—again of no relevance to their current duties in 2023, including Padhye's duties to develop new lines of business for NSP. Emails confirm that Defendant Rayne Bridges also worked towards developing Taycann, and NSP employees remarked that they would frequently see Sana, Bridges, and Padhye having closed door meetings together.

12.     Upon information and belief, Sana and Bridges accepted Padhye's invitation to assist him in launching Taycann while all were still employed by NSP, and despite their NSP agreements. Once they determined to leave NSP and focus on Taycann, Sana and the co-conspirators coordinated their resignation dates within one month of each other. Sana resigned from NSP on July 5, 2023, with an effective date of July 31, 2023, though she ceased working for NSP by July 14, 2023. On the eve of Padhye's resignation on June 22, 2023, while Sana was still employed with NSP, she emailed him trade secret information from NSP's proprietary Databases—information seemingly sent to gather information in preparation of launching Taycann.

13.     Later, by misleading Monday.com personnel, Padhye gained exclusive use of NSP's CRM for a period and locked out all NSP users. When NSP regained access to the system, it discovered several references to Taycann, with comments by Sana noting her sales success on Taycann's behalf.

14.     Following her resignation, Sana and Padhye solicited NSP personnel, including Benjamin Brown, to perform marketing work for her new venture, Taycann.

15.     Sana also engaged in disruptive conduct during her employment, including spreading false statements to NSP employees—such as claiming I wished harm on a senior employee and his wife, and fabricating my net worth to incite dissatisfaction—all of which damaged employee morale and NSP's operations.



16.     As a result of Sana, Bridges, and Padhye's actions, NSP suffered significant financial and reputational harm. NSP's regularly had income of over $10 million per year, with 2022 net profit of over $3.4 million, but that was down in 2023 to net profit of over $2.3 million after the conduct complained of herein by Sana, Bridges, and Padhye.

17.     Their solicitation of employees and disruptive conduct fractured NSP's workforce and hindered its operations. In the end, the unlawful conduct, exodus from NSP, shirking of NSP duties, and discord sowed amongst NSP's workforce and ultimately caused NSP to pause its business operations while it regroups and rehires. However, NSP continues to maintain its leases, continues to own its pharmaceutical equipment, and is considering its relaunch plans.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  4/15/2025

*Sanjiv Dhawan*

Sanjiv Dhawan



# EXHIBIT A

**HONE LAW**
Jennifer W. Arledge, NV Bar No. 8729
jarledge@hone.law
Kelly B. Stout, NV Bar No. 12105
kstout@hone.law
701 N. Green Valley Parkway, Suite 200
Henderson, NV 89074
Phone  702-608-3720
Fax      702-608-7814

Nitoj P. Singh, CA Bar No. 265005*
nsingh@dhillonlaw.com
Anthony J. Fusaro, Jr., CA Bar No. 345017*
afusaro@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, CA 94108
Phone  415-433-1700
Fax      415-520-6593
*Admitted Pro Hac Vice*

*Attorneys for Plaintiff*
NATIONAL SPECIALTY PHARMACY LLC

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| NATIONAL SPECIALTY PHARMACY LLC,<br><br>      Plaintiff,<br><br>vs.<br><br>MAYBELLINE SANA, an individual; RAYNE BRIDGES, an individual; and DOES 1 to 49, inclusive,<br><br>      Defendants. | Case No. 2:25-cv-00295-CDS-MDC<br><br>**PLAINTIFF NATIONAL SPECIALTY PHARMACY LLC'S TRADE SECRET IDENTIFICATION** |



1

**TRADE SECRET IDENTIFICATION**

Plaintiff National Specialty Pharmacy, LLC ("NSP") identifies the following trade secrets that are the subject of its trade secret misappropriation claims in this Action:

1.       Data stored on NSP's CRM Monday.com, including the identity and contact information of NSP's current patients and health care provider (physician, home health agency, or other provider), whether the provider worked with White Card program patients, number of referrals the provider has made to NSP, number of patients per provider; and how NSP prioritizes current provider for further outreach; NSP's list of target health care providers in California, New Mexico, and Tennessee for future business development; pricing, budget, and ordering history for NSP's marketing materials; marketing event pricing, budget, attendee information, and profitability based on new leads and patients per marketing event; NSP's master patient list, including name, contact information, date of last prescription, insurance information, and number of prescriptions per year.

2.       Data stored on NSP's patient-provider database, including, patient name and associated contact information, healthcare provider information, insurance information, indication / condition / diagnosis, prescriptions and durable medical equipment, pricing strategy, purchase / cost / profit history, and dates, all sortable including by region and provider to identify most profitable providers, regions, patients, or conditions.

3.       Data stored on NSP's pharmaceutical and equipment database, including, pharmaceutical product formulations per indication, mixing and dispensing specifics, vendor and supplier information for the formulations, negotiated pricing information, including controlled substance pricing, average wholesale price, and average retail price.

4.       NSP's financial data, including financial statements such as profit and loss statements, and balance sheets; financial modeling and trend analysis for medical provider referrals and ongoing patient care strategies; profitability of various segments of NSP's business, including non-DOL compounding versus DOL compounding.

5.       NSP's Confidential Policies and Procedures Manual.

6.      NSP's White Card Market Analysis, including locations of White Card patients and associated DOE sites, number of patients per region, data on the medical providers in the region, analysis of expansion opportunities/competitors in the region, regional compounding pharmacies, and notes regarding NSP's outreach efforts to medical providers in the region, including whether the medical providers service White Card patients.

7.      The following documents comprising NSP's indication / disease strategies:

    a.    4200_001.pdf;

    b.    PARKINSON'S_PACKAGE-TN.docx; and

    c.    DOL-White_Card_Commonly_Covered_Medications_per_Disease_State.docx.

8.      The following documents comprising NSP's data and analysis comparing insurance and DOE/White Card claim comparison (rejection and approval), based on indication, prescription, equipment, and pricing:

    a.    Mymatrixx_vs_DOE_Ins.xlsx; and

    b.    MyMatrixx_6.5.23.xlsx.

# EXHIBIT B

### NATIONAL SPECIALTY PHARMACY, LLC
### AT-WILL EMPLOYMENT, CONFIDENTIAL INFORMATION,
### AND INVENTION ASSIGNMENT AGREEMENT

As a condition of my employment with National Specialty Pharmacy, LLC, its subsidiaries, affiliates, successors or assigns (together, the "**Company**"), and in consideration of my employment with the Company and my receipt of the compensation now and hereafter paid to me by Company, I agree to the following provisions of this National Specialty Pharmacy, LLC At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement (this "**Agreement**"):

1.    AT-WILL EMPLOYMENT

I UNDERSTAND AND ACKNOWLEDGE THAT MY EMPLOYMENT WITH THE COMPANY IS FOR NO SPECIFIED TERM AND CONSTITUTES "AT-WILL" EMPLOYMENT. I ALSO UNDERSTAND THAT ANY REPRESENTATION TO THE CONTRARY IS UNAUTHORIZED AND NOT VALID UNLESS IN WRITING AND SIGNED BY THE AN AUTHORIZED REPRESENTATIVE OF NATIONAL SPECIALTY PHARMACY, LLC ACCORDINGLY, I ACKNOWLEDGE THAT MY EMPLOYMENT RELATIONSHIP MAY BE TERMINATED AT ANY TIME, WITH OR WITHOUT GOOD CAUSE OR FOR ANY OR NO CAUSE, AT MY OPTION OR AT THE OPTION OF THE COMPANY, WITH OR WITHOUT NOTICE. I FURTHER ACKNOWLEDGE THAT THE COMPANY MAY MODIFY JOB TITLES, SALARIES, AND BENEFITS FROM TIME TO TIME AS IT DEEMS NECESSARY.

2.    APPLICABILITY TO PAST ACTIVITIES

National Specialty Pharmacy, LLC and I acknowledge that I have been engaged to provide services by National Specialty Pharmacy, LLC for a period of time prior to the date of this Agreement (the "**Prior Engagement Period**"). Accordingly, I agree that if and to the extent that, during the Prior Engagement Period: (i) I received access to any information from or on behalf of Company that would have been "Company Confidential Information" (as defined below) if I received access to such information during the period of my employment with Company under this Agreement; or (ii) I conceived, created, authored, invented, developed or reduced to practice any item, including any intellectual property rights with respect thereto, that would have been an "Invention" (as defined below) if conceived, created, authored, invented, developed or reduced to practice during the period of my employment with Company under this Agreement; then any such information shall be deemed "Company Confidential Information" hereunder and any such item shall be deemed an "Invention" hereunder, and this Agreement shall apply to such information or item as if conceived, created, authored, invented, developed or reduced to practice under this Agreement.

3.    CONFIDENTIALITY

A.    *Definition of Confidential Information.* I understand that "**Company Confidential Information**" means information (including any and all combinations of individual items of information) that the Company has or will develop, acquire, create, compile, discover or

*ka* 5-21-18

own, that has value in or to the Company's business which is not generally known and which the Company wishes to maintain as confidential. Company Confidential Information includes both information disclosed by the Company to me, and information developed or learned by me during the course of my employment with Company. Company Confidential Information also includes all information of which the unauthorized disclosure could be detrimental to the interests of Company, whether or not such information is identified as Company Confidential Information. By example, and without limitation, Company Confidential Information includes any and all non-public information that relates to the actual or anticipated business and/or products, research or development of the Company, or to the Company's technical data, trade secrets, or know-how, including, but not limited to, research, product plans, or other information regarding the Company's products or services and markets therefor, customer lists, patient and physician information, and customers (including, but not limited to, customers of the Company on which I called or with which I may become acquainted during the term of my employment), software, developments, inventions, discoveries, ideas, processes, formulas, technology, designs, drawings, hardware configuration information, marketing, finances, and other business information disclosed by the Company either directly or indirectly in writing, orally or by drawings or inspection of premises, parts, equipment, or other Company property. Notwithstanding the foregoing, Company Confidential Information shall not include any such information which I can establish (i) was publicly known or made generally available prior to the time of disclosure by Company to me; (ii) becomes publicly known or made generally available after disclosure by Company to me through no wrongful action or omission by me; or (iii) is in my rightful possession, without confidentiality obligations, at the time of disclosure by Company as shown by my then-contemporaneous written records; provided that any combination of individual items of information shall not be deemed to be within any of the foregoing exceptions merely because one or more of the individual items are within such exception, unless the combination as a whole is within such exception. I understand that nothing in this Agreement is intended to limit employees' rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law.

      B.    *Nonuse and Nondisclosure.* I agree that during and after my employment with the Company, I will hold in the strictest confidence, and take all reasonable precautions to prevent any unauthorized use or disclosure of Company Confidential Information, and I will not (i) use the Company Confidential Information for any purpose whatsoever other than for the benefit of the Company in the course of my employment, or (ii) disclose the Company Confidential Information to any third party without the prior written authorization of an authorized representative of the Company. Prior to disclosure when compelled by applicable law; I shall provide prior written notice to the General Counsel of National Specialty Pharmacy, LLC. I agree that I obtain no title to any Company Confidential Information, and that as between Company and myself, National Specialty Pharmacy, LLC retains all Confidential Information as the sole property of National Specialty Pharmacy, LLC I understand that my unauthorized use or disclosure of Company Confidential Information during my employment may lead to disciplinary action, up to and including immediate termination and legal action by the Company. I understand that my obligations under this **Section 3.B** shall continue after termination of my employment.

      C.    *Former Employer Confidential Information.* I agree that during my employment with the Company, I will not improperly use, disclose, or induce the Company to use any proprietary information or trade secrets of any former employer or other person or entity with

*Aff 5·21·18*

which I have an obligation to keep in confidence. I further agree that I will not bring onto the Company's premises or transfer onto the Company's technology systems any unpublished document, proprietary information, or trade secrets belonging to any such third party unless disclosure to, and use by, the Company has been consented to in writing by such third party.

        D.     *Third Party Information.* I recognize that the Company has received and in the future will receive from third parties associated with the Company, e.g., the Company's customers, suppliers, physicians, patients, partners, or collaborators ("**Associated Third Parties**"), their confidential or proprietary information ("**Associated Third Party Confidential Information**") subject to a duty under HIPAA and on the Company's part to maintain the confidentiality of such Associated Third Party Confidential Information and to use it only for certain limited purposes. I agree at all times during my employment with the Company and thereafter, that I owe the Company and its Associated Third Parties a duty to hold all such Associated Third Party Confidential Information in the strictest confidence, and not to use it or to disclose it to any person, firm, corporation, or other third party except as necessary in carrying out my work for the Company consistent with the Company's agreement with such Associated Third Parties. I further agree to comply with any and all laws, regulations and Company policies and guidelines that may be adopted from time to time regarding Associated Third Parties and Associated Third Party Confidential Information. I understand that my unauthorized use or disclosure of Associated Third Party Confidential Information or violation of any law, regulation or Company policies during my employment may lead to disciplinary action, up to and including immediate termination and legal action by the Company and the relevant regulatory agencies.

**4.**    <u>OWNERSHIP</u>

        A.     *Assignment of Inventions.* As between the Company and myself, I agree that all right, title, and interest in and to any and all copyrightable material, notes, records, drawings, designs, inventions, improvements, developments, discoveries, ideas and trade secrets conceived, discovered, authored, invented, developed or reduced to practice by me, solely or in collaboration with others, during the period of time I am in the employ of the Company (including during my off-duty hours), or with the use of Company's equipment, supplies, facilities, or Company Confidential Information, and any copyrights, patents, trade secrets, mask work rights or other intellectual property rights relating to the foregoing, except as provided in **Section Error! Reference source not found.** below (collectively, "**Inventions**"), are the sole property of National Specialty Pharmacy, LLC I also agree to promptly make full written disclosure to National Specialty Pharmacy, LLC of any Inventions, and to deliver and assign and hereby irrevocably assign fully to National Specialty Pharmacy, LLC all of my right, title and interest in and to Inventions. I agree that this assignment includes a present conveyance to National Specialty Pharmacy, LLC of ownership of Inventions that are not yet in existence. I further acknowledge that all original works of authorship that are made by me (solely or jointly with others) within the scope of and during the period of my employment with the Company and that are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act. I understand and agree that the decision whether or not to commercialize or market any Inventions is within the Company's sole discretion and for the Company's sole benefit, and that no royalty or other consideration will be due to me as a result of the Company's efforts to commercialize or market any such Inventions.

-3-

*LQ  5-21-18*

B.    *Pre-Existing Materials*. I will inform National Specialty Pharmacy, LLC in writing before incorporating any inventions, discoveries, ideas, original works of authorship, developments, improvements, trade secrets and other proprietary information or intellectual property rights owned by me or in which I have an interest prior to, or separate from, my employment with the Company ("**Prior Inventions**") into any Invention or otherwise utilizing any such Prior Invention in the course of my employment with the Company; and the Company is hereby granted a nonexclusive, royalty-free, perpetual, irrevocable, transferable worldwide license (with the right to grant and authorize sublicenses) to make, have made, use, import, offer for sale, sell, reproduce, distribute, modify, adapt, prepare derivative works of, display, perform, and otherwise exploit such Prior Inventions, without restriction, including, without limitation, as part of or in connection with such Invention, and to practice any method related thereto. I will not incorporate any inventions, discoveries, ideas, original works of authorship, developments, improvements, trade secrets and other proprietary information or intellectual property rights owned by any third party into any Invention without National Specialty Pharmacy, LLC's prior written permission. I have attached hereto as **Exhibit A**, a list describing all Prior Inventions or, if no such list is attached, I represent and warrant that there are no such Prior Inventions. Furthermore, I represent and warrant that if any Prior Inventions are included on **Exhibit A**, they will not materially affect my ability to perform all obligations under this Agreement.

C.    *Moral Rights*. Any assignment to National Specialty Pharmacy, LLC of Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "**Moral Rights**"). To the extent that Moral Rights cannot be assigned under applicable law, I hereby waive and agree not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

D.    *Maintenance of Records*. I agree to keep and maintain adequate, current, accurate, and authentic written records of all Inventions made by me (solely or jointly with others) during the term of my employment with the Company. The records will be in the form of notes, sketches, drawings, electronic files, reports, or any other format that may be specified by the Company. As between Company and myself, the records are and will be available to and remain the sole property of National Specialty Pharmacy, LLC at all times.

E.    *Further Assurances*. I agree to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, and all other instruments that the Company shall deem proper or necessary in order to apply for, register, obtain, maintain, defend, and enforce such rights, and in order to deliver, assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title, and interest in and to all Inventions, and testifying in a suit or other proceeding relating to such Inventions. I further agree that my obligations under this **Section 4.E** shall continue after the termination of this Agreement.

-4-

F. *Attorney-in-Fact*. I agree that, if the Company is unable because of my unavailability, mental or physical incapacity, or for any other reason to secure my signature with respect to my Inventions, including, without limitation, for the purpose of applying for or pursuing any application for any United States or foreign patents or mask work or copyright registrations covering the Inventions assigned to National Specialty Pharmacy, LLC in **Section 4.A**, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney-in-fact, to act for and on my behalf to execute and file any papers and oaths, and to do all other lawfully permitted acts with respect to such Inventions to further the prosecution and issuance of patents, copyright and mask work registrations with the same legal force and effect as if executed by me. This power of attorney shall be deemed coupled with an interest, and shall be irrevocable.

5. <u>CONFLICTING OBLIGATIONS</u>

A. *Current Obligations*. I agree that during the term of my employment with the Company, I will not engage in or undertake any other employment, occupation, consulting relationship, or commitment that is directly related to the business in which the Company is now involved or becomes involved or has plans to become involved, nor will I engage in any other activities that conflict with my obligations to the Company.

B. *Prior Relationships*. Without limiting **Section 5.A**, I represent and warrant that I have no other agreements, relationships, or commitments to any other person or entity that conflict with the provisions of this Agreement, my obligations to the Company under this Agreement, or my ability to become employed and perform the services for which I am being hired by the Company. I further agree that if I have signed a confidentiality agreement or similar type of agreement with any former employer or other entity, I will comply with the terms of any such agreement to the extent that its terms are lawful under applicable law. I represent and warrant that after undertaking a careful search (including searches of my computers, cell phones, electronic devices, and documents), I have returned all property and confidential information belonging to all prior employers (and/or other third parties I have performed services for in accordance with the terms of my applicable agreement). Moreover, I agree to fully indemnify the Company, its directors, officers, agents, employees, investors, shareholders, administrators, affiliates, divisions, subsidiaries, predecessor and successor corporations, and assigns for all verdicts, judgments, settlements, and other losses incurred by any of them resulting from my breach of my obligations under any agreement with a third party to which I am a party or obligation to which I am bound, as well as any reasonable attorneys' fees and costs if the plaintiff is the prevailing party in such an action, except as prohibited by law.

6. <u>RETURN OF COMPANY MATERIALS</u>

A. *Definition of Electronic Media Equipment and Electronic Media Systems*. I understand that **"Electronic Media Equipment"** includes, but is not limited to, computers, external storage devices, thumb drives, handheld electronic devices, telephone equipment, and other electronic media devices. I understand that **"Electronic Media Systems"** includes, but is not limited to, computer servers, messaging and email systems or accounts, and web-based services (including

*MQ 5-21-18*

cloud-based information storage accounts), whether provided for my use directly by the company or by third-party providers on behalf of the company.

        B.     *Return of Company Property.* I understand that anything that I created or worked on for the Company while working for the Company belongs solely to the Company and that I cannot remove, retain, or use such information without the Company's express written permission. Accordingly, upon separation from employment with the Company or upon the Company's request at any other time, I will immediately deliver to National Specialty Pharmacy, LLC, and will not keep in my possession, recreate, or deliver to anyone else, any and all Company property, including, but not limited to, Company Confidential Information, Associated Third Party Confidential Information, all Company equipment including all Company Electronic Media Equipment, all tangible embodiments of the Inventions, all electronically stored information and passwords to access such property, Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, charts, any other documents and property, and reproductions of any of the foregoing items, including, without limitation, those records maintained pursuant to **Section 4.D**.

        C.     *Return of Company Information on Company Electronic Media Equipment.* In connection with my obligation to return information to the Company, I agree that I will not copy, delete, or alter any information, including personal information voluntarily created or stored, contained upon my Company Electronic Media Equipment before I return the information to the Company.

        D.     *Return of Company Information on Personal Electronic Media Equipment.* In addition, if I have used any personal Electronic Media Equipment or personal Electronic Media Systems to create, receive, store, review, prepare or transmit any Company information, including but not limited to, Company Confidential Information, I agree to make a prompt and reasonable search for such information in good faith, including reviewing any personal Electronic Media Equipment or personal Electronic Media Systems to locate such information and if I locate such information I agree to notify the Company of that fact and then provide the Company with a computer-useable copy of all such Company information from those equipment and systems; and I agree to cooperate reasonably with the Company to verify that the necessary copying is completed (including upon request providing a sworn declaration confirming the return of property and deletion of information), and, upon confirmation of compliance by the Company, I agree to delete and expunge all Company information.

        E.     *No Expectation of Privacy in Company Property.* I understand that I have no expectation of privacy in Company property, and I agree that any Company property situated on Company premises, or held by third-party providers for the benefit of the company, is subject to inspection by Company personnel at any time with or without further notice. I also understand and agree that as it relates to the Company's desire to protect its confidential and proprietary information, I have no expectation of privacy as to any personal Electronic Media Equipment or personal Electronic Media Systems that I have used for Company purposes. I further agree that the Company, at its sole discretion, may have access to such personal Electronic Media Equipment or personal Electronic Media Systems to retrieve, destroy, or ensure the permanent deletion of Company information from such equipment or systems. I also consent to an exit interview and an

audit to confirm my compliance with this **Section 6**, and I will certify in writing that I have complied with the requirements of this **Section 6**.

### 7. TERMINATION CERTIFICATION

Upon separation from employment with the Company, I agree to immediately sign and deliver to the Company the "Termination Certification" attached hereto as <u>Exhibit C</u>. I also agree to keep National Specialty Pharmacy, LLC advised of my home and business address for a period of three (3) years after termination of my employment with the Company, so that the Company can contact me regarding my continuing obligations provided by this Agreement.

### 8. NOTIFICATION OF NEW EMPLOYER

In the event that I leave the employ of the Company, I hereby grant consent to notification by the Company to my new employer about my obligations under this Agreement.

### 9. SOLICITATION OF EMPLOYEES

To the fullest extent permitted under applicable law, I agree that during my employment and for a period of twelve (12) months immediately following the termination of my relationship with the Company for any reason, whether voluntary or involuntary, with or without cause, I will not directly or indirectly solicit any of the Company's employees to leave their employment at the Company. I agree that nothing in this **Section** 9 shall affect my continuing obligations under this Agreement during and after this twelve (12) month period, including, without limitation, my obligations under **Section** 3.

### 10. CONFLICT OF INTEREST GUIDELINES

I agree to diligently adhere to all policies of the Company, including the Company's insider trading policies and the Company's Conflict of Interest Guidelines. A copy of the Company's current Conflict of Interest Guidelines is attached as <u>Exhibit D</u> hereto, but I understand that these Conflict of Interest Guidelines may be revised from time to time during my employment.

### 11. REPRESENTATIONS

Without limiting my obligations under **Section 4.E** above, I agree to execute any proper oath or verify any proper document required to carry out the terms of this Agreement. I represent and warrant that my performance of all the terms of this Agreement will not breach any agreement to keep in confidence information acquired by me in confidence or in trust prior to my employment by the Company. I hereby represent and warrant that I have not entered into, and I will not enter into, any oral or written agreement in conflict herewith.

### 12. NON-CIRCUMVENTION, NON-COMPETITION AND NON-SOLICITATION

I agree that I will not directly or indirectly, individually or together with any other persons, investors, firms or companies (a) interfere with, circumvent, avoid, bypass or obviate, or permit any of its representatives or affiliates to interfere with, circumvent, avoid, bypass or obviate the

-7-

*RA  5·21·18*

Company's (or any of its representatives or affiliates') right in, agreements relating to and/or contacts with respect to any of the Company's current or proposed customers or clients (b) enter into discussions with any third party introduced to me by the Company (or any of such party's members, shareholders, officers, directors, employees, agents, affiliates, creditors or contractual counterparts), or initiate or negotiate with respect to any transactional relationship with any such third party (or any of its shareholders, officers, directors, employees, agents, affiliates creditors or contractual counterparts), or circumvent or attempt to circumvent the discussions and negotiations currently or hereafter entered into with respect to the Company's current or proposed customers or clients. In the event that my employment or other business relationship with the Company is terminated for any reason, I agree that I will not, for a period of 3 years from the date of such termination, engage in any business that is competitive with the Company within a 5 mile radius of any physical location of the Company nor solicit the services of any current or future employee or consultant of the Company

## 13.    AUDIT

I acknowledge that I have no reasonable expectation of privacy in any computer, handheld device, telephone, voicemail, email or other technology system that is used to conduct the business of the Company. All information, data, and messages created, received, sent, or stored in these systems are, at all times, the property of the Company. As such, the Company has the right to audit and search all such items and systems, without further notice to me, to ensure that the Company is licensed to use the software on the Company's devices in compliance with the Company's software licensing policies, to ensure compliance with the Company's policies, and for any other business-related purposes in the Company's sole discretion. I understand that I am not permitted to add any unlicensed, unauthorized, or non-compliant applications to the Company's technology systems, including, without limitation, open source or free software not authorized by the Company, and that I shall refrain from copying unlicensed software onto the Company's technology systems or using non-licensed software or websites. I understand that it is my responsibility to comply with the Company's policies governing use of the Company's documents and the internet, email, telephone, and technology systems to which I will have access in connection with my employment.

I am aware that the Company has or may acquire software and systems that are capable of monitoring and recording all Company network traffic to and from any computer, handheld device, telephone, voicemail, email or other technology system I may use to access the Company's internal networks. The Company reserves the right to access, review, copy, and delete any of the information, data, or messages accessed through these systems with or without notice to me and/or in my absence. This includes, but is not limited to, all e-mail messages sent or received, all website visits, all chat sessions, all news group activity (including groups visited, messages read, and postings by me), and all file transfers into and out of the Company's internal networks. The Company further reserves the right to retrieve previously deleted messages from e-mail or voicemail and monitor usage of the Internet, including websites visited and any information I have downloaded. In addition, the Company may review Internet and technology systems activity and analyze usage patterns, and may choose to publicize this data to assure that technology systems are devoted to legitimate business purposes.

*JH* 5-21-18

14.    **MISCELLANEOUS**

A.    *Governing Law; Consent to Personal Jurisdiction.* This Agreement will be governed by the laws of the State of Nevada without regard to Nevada's conflicts of law rules that may result in the application of the laws of any jurisdiction other than Nevada. To the extent that any lawsuit is permitted under this Agreement, I hereby expressly consent to the personal and exclusive jurisdiction and venue of the state and federal courts located in Nevada for any lawsuit filed against me by the Company.

B.    *Assignability.* This Agreement will be binding upon my heirs, executors, assigns, administrators, and other legal representatives, and will be for the benefit of the Company, its successors, and its assigns. There are no intended third-party beneficiaries to this Agreement, except as may be expressly otherwise stated. Notwithstanding anything to the contrary herein, National Specialty Pharmacy, LLC may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of National Specialty Pharmacy, LLC's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or stock, or otherwise.

C.    *Entire Agreement.* This Agreement, together with the Exhibits herein and any executed written offer letter between me and the Company, to the extent such materials are not in conflict with this Agreement, sets forth the entire agreement and understanding between the Company and me with respect to the subject matter herein and supersedes all prior written and oral agreements, discussions, or representations between us, including, but not limited to, any representations made during my interview(s) or relocation negotiations. I represent and warrant that I am not relying on any statement or representation not contained in this Agreement. Any subsequent change or changes in my duties, salary, compensation, conditions or any other terms of my employment will not affect the validity or scope of this Agreement.

D.    *Headings.* Headings are used in this Agreement for reference only and shall not be considered when interpreting this Agreement.

E.    *Severability.* If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be invalid or unenforceable, such provision will be enforced to the maximum extent permissible so as to effect the intent of the Parties, and the remainder of this Agreement will continue in full force and effect.

F.    *Modification, Waiver.* No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in a writing signed by the an authorized representative of National Specialty Pharmacy, LLC and me. Waiver by National Specialty Pharmacy, LLC of a breach of any provision of this Agreement will not operate as a waiver of any other or subsequent breach.

G.    *Survival.* The rights and obligations of the parties to this Agreement will survive termination of my employment with the Company.

-9-

Date: _5-21-18_

Signature

_MAYBELLINE ASH_
Name of Employee (typed or printed)

Witness:

Signature

Name (typed or printed)

## EXHIBIT C

## NATIONAL SPECIALTY PHARMACY, LLC TERMINATION CERTIFICATION

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, any other documents or property, or reproductions of any and all aforementioned items belonging to National Specialty Pharmacy, LLC, its subsidiaries, affiliates, successors or assigns (together, the "**Company**").

I further certify that I have complied with all the terms of the Company's At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement signed by me, including the reporting of any inventions and original works of authorship (as defined therein) conceived or made by me (solely or jointly with others), as covered by that agreement.

I further agree that, in compliance with the At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement, I will preserve as confidential all Company Confidential Information and Associated Third Party Confidential Information, including trade secrets, confidential knowledge, data, or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, databases, other original works of authorship, customer lists, business plans, financial information, or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants, or licensees.

I also agree that for twelve (12) months from this date, I will not directly or indirectly solicit any of the Company's employees to leave their employment at the Company. I agree that nothing in this paragraph shall affect my continuing obligations under the At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement during and after this twelve (12) month period, including, without limitation, my obligations under **Section** 3 (Confidentiality) thereof.

After    leaving    the    Company's    employment,    I    will    be    employed    by

_____ in the position of

_____.


Date: _____     _____

                                  Signature

                                  _____

                                  Name of Employee (typed or printed)

Address for Notifications:        _____

                                  _____

-2-

*[handwritten: 5-21-18]*

## EXHIBIT D

## NATIONAL SPECIALTY PHARMACY, LLC CONFLICT OF INTEREST GUIDELINES

It is the policy of National Specialty Pharmacy, LLC to conduct its affairs in strict compliance with the letter and spirit of the law and to adhere to the highest principles of business ethics. Accordingly, all officers, employees, and independent contractors must avoid activities that are in conflict, or give the appearance of being in conflict, with these principles and with the interests of the Company. The following are potentially compromising situations that must be avoided:

1.  Revealing confidential information to outsiders or misusing confidential information. Unauthorized divulging of information is a violation of this policy whether or not for personal gain and whether or not harm to the Company is intended. (The At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement elaborates on this principle and is a binding agreement.)

2.  Accepting or offering substantial gifts, excessive entertainment, favors, or payments that may be deemed to constitute undue influence or otherwise be improper or embarrassing to the Company.

3.  Participating in civic or professional organizations that might involve divulging confidential information of the Company.

4.  Initiating or approving personnel actions affecting reward or punishment of employees or applicants where there is a family relationship or is or appears to be a personal or social involvement.

5.  Initiating or approving any form of personal or social harassment of employees.

6.  Investing or holding outside directorship in suppliers, customers, or competing companies, including financial speculations, where such investment or directorship might influence in any manner a decision or course of action of the Company.

7.  Borrowing from or lending to employees, customers, or suppliers.

8.  Acquiring real estate of interest to the Company.

9.  Improperly using or disclosing to the Company any proprietary information or trade secrets of any former or concurrent employer or other person or entity with whom obligations of confidentiality exist.

10. Unlawfully discussing prices, costs, customers, sales, or markets with competing companies or their employees.

11. Making any unlawful agreement with distributors with respect to prices.

12. Improperly using or authorizing the use of any inventions that are the subject of patent claims of any other person or entity.

13. Engaging in any conduct that is not in the best interest of the Company.

Each officer, employee, and independent contractor must take every necessary action to ensure compliance with these guidelines and to bring problem areas to the attention of higher

management for review. Violations of this conflict of interest policy may result in discharge without warning. I understand that nothing in this Agreement is intended to limit employees' rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law.

-2-

*[signature]* 5·21·-18

# EXHIBIT C

 
202251717816



**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**ARTICLES OF ORGANIZATION**
**CA LIMITED LIABILITY COMPANY**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

| For Office Use Only |
| --- |
| **-FILED-** |
| File No.: 202251717816 |
| Date Filed: 7/28/2022 |

| Limited Liability Company Name | |
| --- | --- |
| Limited Liability Company Name | Taycan, LLC |

| Initial Street Address of Principal Office of LLC | |
| --- | --- |
| Principal Address | 10211 BYRNE AVE.<br>CUPERTINO, CA 95014 |

| Initial Mailing Address of LLC | |
| --- | --- |
| Mailing Address | 10211 BYRNE AVE.<br>CUPERTINO, CA 95014 |
| Attention | Sameer Padhye |

| Agent for Service of Process | |
| --- | --- |
| California Registered Corporate Agent (1505) | COGENCY GLOBAL INC.<br>Registered Corporate 1505 Agent |

**Purpose Statement**

The purpose of the limited liability company is to engage in any lawful act or activity for which a limited liability company may be organized under the California Revised Uniform Limited Liability Company Act.

| Management Structure | |
| --- | --- |
| The LLC will be managed by | One Manager |

Additional information and signatures set forth on attached pages, if any, are incorporated herein by reference and made part of this filing.

**Electronic Signature**

☒ By signing, I affirm under penalty of perjury that the information herein is true and correct and that I am authorized by California law to sign.

*Rafael Pacquing*                          07/28/2022
_____          _____
Organizer Signature                        Date

B0961-1622 07/28/2022 2:34 PM Received by California Secretary of State